1  SCOTT A. EDELMAN, SBN 116927
   SEdelman@gibsondunn.com
2  ANGELIQUE KAOUNIS, SBN 209833
3  AKaounis@gibsondunn.com
   ADAM L. YARIAN, SBN 281040
4  AYarian@gibsondunn.com
5  GIBSON, DUNN & CRUTCHER LLP
   2029 Century Park East, Suite 4000
6  Los Angeles, CA 90067-3026
7  Telephone: 310.552.8500
   Facsimile: 310.551.8741
8
9  Attorneys for Plaintiffs
   GENERAL ELECTRIC COMPANY
10 and GE AVIATION SYSTEMS LLC

11              UNITED STATES DISTRICT COURT

12             CENTRAL DISTRICT OF CALIFORNIA

13                    WESTERN DIVISION

14

15 General Electric Company and GE      CASE NO. **CV13-08670 DDP (FFMx)**
   Aviation Systems LLC,
16                                       **COMPLAINT AND DEMAND FOR**
                    Plaintiffs,          **JURY TRIAL FOR:**
17
           v.
18                                       (1) **VIOLATIONS OF THE COMPUTER**
   Erwin Wenti Liang and Does 1-10,          **FRAUD AND ABUSE ACT (18 U.S.C.**
19 Inclusive,                                **§§ 1030);**
                                         (2) **VIOLATIONS OF THE**
20                  Defendants.              **COMPREHENSIVE COMPUTER**
                                             **DATA ACCESS AND FRAUD ACT**
21                                           **(CAL. PENAL CODE § 502);**
                                         (3) **TRADE SECRET**
22                                           **MISAPPROPRIATION (CAL. CIV.**
                                             **CODE §§ 3426-3426.11);**
23                                       (4) **BREACH OF CONTRACT**
24                                       (5) **CONVERSION;**
                                         (6) **UNFAIR COMPETITION (CAL.**
25                                           **BUS. & PROF. CODE § 17200** *et seq.*)
26

27

28

FILED
CLERK, U.S. DISTRICT COURT
NOV 25 2013
CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

Plaintiffs General Electric Company ("GE" or "the Company") and GE Aviation Systems LLC (collectively "Plaintiffs"), by and through their attorneys, hereby submit the following Complaint and Jury Trial Demand against Defendants Erwin Wenti Liang ("Liang") and Does 1-10, inclusive, seeking relief for violations of the Computer Fraud and Abuse Act (18 U.S.C. §1030), violations of the Comprehensive Computer Data Access and Fraud Act (California Penal Code § 502), violations of the California Uniform Trade Secrets Act (Cal. Civ. Code § 3426.1 et seq.), breach of contract, conversion, and unfair competition (under California Business and Professions Code § 17200 *et seq.*) as set forth below. GE alleges on personal knowledge as to all facts known to it, and on information and belief as to all other facts, as follows:

## INTRODUCTION

1.     GE has discovered that Defendant Liang, a former employee of GE's wholly-owned subsidiary GE Aviation Systems LLC ("GE Aviation"), has accessed and copied numerous electronic files owned by the Company in violation of several GE policies concerning the handling and protection of GE intellectual property, the use of GE information resources, and GE ethics. GE is diligently investigating the scope and impact of Liang's conduct, and trying to determine what Liang has done with this misappropriated data. Accordingly, GE files this Complaint and seeks expedited injunctive relief from this Court to enable it to recover what Liang has taken, to prevent disclosure of this information, and to attempt to remediate competitive harm to GE by allowing GE to conduct expedited discovery to ascertain the identities of any third parties to whom disclosure may have already occurred.

2.     Specifically, GE seeks to prevent Liang from retaining, copying,[1] using, disseminating, or otherwise profiting from the confidential, proprietary, and/or trade secret information (collectively, "GE Intellectual Property") contained in the files that

---

[1] As used in this Complaint and Prayer, "copying" includes downloading from a website and/or uploading to digital storage media, a cloud-based server, or a website.

1  he accessed and copied from GE's password-protected internal website. The vast

2  majority of material that Liang obtained from GE's internal servers was outside the

3  scope of his duties for GE and his subsequent employer (which purchased the

4  subdivision of the GE business unit where Liang worked), and he was not permitted to

5  access or use that information under policies governing his employment at GE and his

6  subsequent employer.

7       3.     GE believes that Liang attempted to copy as much GE Intellectual

8  Property as he could from GE's internal network—including a repository of internal

9  GE business information known as GE Libraries (GE's "SupportCentral" Database and

10  GE's Document Management System)—because he knew that his access to GE

11  electronic resources was set to expire in mid-November, 2013. To facilitate the

12  extraction of these files, GE believes that Liang (1) conducted targeted searches for

13  specified terms and/or (2) used a program to extract select data at high rates of speed

14  (and perhaps go undetected). GE is unsure what Liang has done with the files that he

15  misappropriated, but is informed and believes that he has multiple personal email

16  accounts, at least one Facebook account, and a cloud-based storage account—through

17  which the dissemination of this information to third parties could still be readily

18  accomplished. On information and belief, Liang also has one or more security deposit

19  boxes and/or bank accounts in China. On information and belief, as of the filing of

20  this Complaint, Liang and/or his agents, associates and co-conspirators still remain in

21  possession of some or all of the GE Intellectual Property that he wrongfully obtained.

22       4.     GE twice made written demands that Liang immediately return all GE

23  Intellectual Property in his possession, and that he immediately cease and desist from

24  using or disclosing any such property or information to any third party. GE also

25  demanded that to the extent that Liang has already disseminated GE Intellectual

26  Property to any third party, (a) he take all necessary measures to retrieve, and prevent

27  the use or disclosure of, that information; and (b) he identify and provide contact

28  information for each third party to whom disclosures were made. Additionally, GE

1    demanded that in the event that Liang refuse to return GE's intellectual property, he

2    make available for inspection and copying by a third party neutral forensic analyst any

3    GE Intellectual Property in his possession, and further that he take all necessary

4    measures to preserve any GE Intellectual Property in his possession.  GE also

5    demanded that Liang take all necessary measures to preserve any other information

6    that is related in any manner to his employment at GE or his subsequent employer, or

7    any other business activities in which he is, or has been involved over the last three

8    years.  Liang has not agreed to these demands, although on information and belief, the

9    FBI has confiscated certain electronic devices that were in Liang's former counsel's

10   possession.

11                              **THE PARTIES**

12            5.      Plaintiff GE is a publicly-traded New York corporation with its principal

13   place of business in Fairfield, Connecticut.

14            6.      Plaintiff GE Aviation Systems LLC is a single-member LLC.  GE

15   Aviation Systems North America Inc. is the sole member of GE Aviation Systems

16   LLC.  GE Aviation Systems North America Inc. is a Delaware corporation with its

17   principal place of business in Ohio.

18            7.      Defendant Erwin Liang is a citizen and resident of California.

19            8.      Defendant Does 1-10 are various as-yet-unidentified individual third

20   parties or corporations affiliated with Liang who GE alleges under information and

21   belief may have participated in the wrongful acts alleged herein.  GE has not been able

22   to obtain the names of said Defendants because Liang has refused to identify and

23   provide contact information for each third party to whom any disclosures of GE

24   Intellectual Property were made.  Once additional information has been obtained

25   through further discovery, GE reserves the right to amend this Complaint to state the

26   true names and capacities of any such additional individual, corporate, or other entity

27   defendants.

28

9.     Upon information and belief, Liang resides and maintains a Post Office Box in Cerritos, CA.  Until December 28, 2012, Liang was employed at GE's former Aviation Systems facility in Duarte, California ("Duarte Facility").  After that time, Liang continued to be employed at the Duarte Facility by Woodward HRT, Inc. ("Woodward"), a company that acquired the segment of GE Aviation in which Liang worked.  Upon information and belief, Liang perpetrated his ongoing improper accessing, copying, disclosure, use, deletion, and/or destruction of GE Intellectual Property from the Duarte Facility and/or his home, both of which are located in this district.  Thus, most or all of Liang's conduct took place in this judicial district.

10.    At all material times, each Defendant was the agent, partner, representative, subsidiary, parent, affiliate, alter ego, and/or co-conspirator of the others, had full knowledge of and gave substantial assistance to the alleged misconduct, and, in doing the things alleged, each was acting within the scope of such agency, partnership, representation, affiliation, or conspiracy.  Each is legally responsible for the acts and omissions of the others.

## JURISDICTION AND VENUE

11.    GE's first cause of action arises under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq*.  Accordingly, this Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1030(g), 28 U.S.C. § 1331, and 28 U.S.C. § 1338.

12.    This Court has supplemental subject matter jurisdiction over the pendent state law claims pursuant to 28 U.S.C. § 1367, because these claims form part of the same case or controversy as the claims brought pursuant to the Computer Fraud and Abuse Act and derive from a common nucleus of operative facts.

13.    This Court also has subject matter jurisdiction over all the claims in this action pursuant to 28 U.S.C. § 1332, as GE and all known Defendants are citizens of different states (New York, Connecticut, Delaware, and Ohio; and California,

1   respectively) and the amount in controversy exceeds the sum or value of $75,000,

2   exclusive of interest and costs.

3       14.    Venue is appropriate in this district, pursuant to 28 U.S.C. § 1391,

4   because a substantial part of the events giving rise to the dispute occurred in this

5   district (either in Duarte, California, where Liang worked, or in Cerritos, California,

6   where Liang resides), and the Court has personal jurisdiction over each of the parties

7   as alleged throughout this Complaint.

8                           **FACTUAL ALLEGATIONS**

9   **Liang's Unauthorized Downloading From GE Libraries**

10      15.    Defendant Liang has worked at GE for almost all of his professional life.

11  From October 1990 to May 2007, Liang was continuously employed within GE's CRD

12  division (now known as GRC, or Global Research Center) in various engineering

13  capacities: first as a Senior Process Engineer (1990-1996); then as a Senior Mechanical

14  Engineer (1997-2000); later as a Senior Product/Process Development Engineer (2001-

15  2005); and, ultimately, as a Senior Mechanical Designer (2006-2007).  In May 2007,

16  Liang left GE to join Honeywell International Corporation as a Senior Technical

17  Manager.  Liang subsequently returned to GE in August 2011—this time as an

18  Engineering Technical Lead within GE Aviation until December 28, 2012.  Liang was

19  employed in the segment of GE Aviation which primarily designs and manufactures

20  products for use in commercial airplanes.  On information and belief, Liang holds

21  and/or is a named inventor on 7 US patents, has 13 patent applications on file with the

22  USPTO, and has written extensively on applied mechanics.

23      16.    In December 2012, a third party corporation—Woodward HRT, Inc.

24  ("Woodward")—acquired the segment of GE Aviation in which Liang was employed.

25  As per the Transition Services Agreement ("TSA") between GE Aviation and

26  Woodward, Liang was transferred to Woodward, and became a Woodward employee

27  effective December 28, 2012.  To facilitate the transition of the business segment in

28  which Liang worked, GE Aviation permitted former GE Aviation employees (now

Woodward employees) to retain access to GE email, GE computers, and GE network resources for approximately 1 year for use solely in GE-Woodward-related activities. This access was facilitated in the case of Liang (and others) through the ongoing use of his GE Single Sign On ("SSO")—a unique ID that allows GE employees to access GE electronic resources when used in combination with a password. Pursuant to Article V, Section 5.01 of this TSA—the document which governed Liang's continued use of the GE's SupportCentral Library and his SSO after December 28, 2012—Liang was required to "comply with all security guidelines (including physical security, network access, internet security, confidentiality and personal data security guidelines)" of GE Aviation and its affiliates (the "GE Entities") of which the GE Entities provided Woodward notice. GE provided notice to Woodward of all of the above mentioned policies and agreements (*see, e.g.,* ¶¶ 29-34) governing the access, use, and/or disclosure of GE Intellectual Property and GE Information Resources. Importantly, the terms of the TSA also stressed that "such access shall be used by such personnel *only* for the purposes contemplated by, and subject to the terms of, this Agreement." (*Id.*; emphasis added; *see also id.* § 11.03.)

17.     Liang's access to GE resources was set to expire in mid-November, 2013 and he knew this fact. In October 2013, GE's Corporate IP Protection Center of Excellence ("IP Protection CoE") group determined that Liang had accessed and downloaded a significant number of files from SupportCentral Library folders, with *almost half* of his activity having taken place over a three week period that same month.[2] To maximize his misappropriation before he lost access to GE's resources, GE believes that Liang used a computer program and/or ran targeted searches for specified key words to extract select data. Investigation to date shows that the folders

---

[2]  The IP Protection CoE works across GE's business operations in 140+ countries and an employee population of more than 300,000. The IP Protection function was established to provide proactive IP protection from known and perceived threats, and is comprised of subject matter experts in computer forensics, trade secret theft investigations, IT security, data analytics, and Data Loss Prevention (DLP) software. What started as a security initiative four years ago is now regarded as a "business imperative" in the protection of GE's competitive advantage around the world.

1    from which Liang copied information contained GE Intellectual Property from several

2    GE businesses with ongoing operations.  Of these many businesses, files from only

3    one—Aviation—were arguably within the scope of Liang's work, though there would

4    be no need for Liang to access the vast majority of the Aviation files that he accessed

5    in order to perform his job.

6         18.    Investigation is still ongoing into the scope and precise nature of this

7    breach, and GE has mobilized a team of forensic experts, lawyers, and subject matter

8    experts who are diligently working on this effort.

9         19.    Based on the results of the investigation to date, GE now believes that this

10   misappropriation occurred primarily between March and October 2013.  GE has also

11   determined that Liang used at least two different removable storage media (*e.g.*, USB)

12   devices to facilitate his copying—both of which were GE purchased, and both of

13   which were only permitted to be used for legitimate GE business purposes.  Liang's

14   misuse of his GE SSO, GE hardware, and GE systems, all in order to access and

15   download GE files outside the scope of his work, violated virtually every—if not

16   every—GE policy regarding information, resources, intellectual property, and ethics

17   that he was bound to uphold.  *See infra,* ¶¶ 27-34.

18        20.    GE's investigation has also revealed that during the same time period that

19   Liang was accessing and copying GE's Intellectual Property (March to October 2013),

20   he was actively submitting job applications to at least one third-party competitor of

21   GE.

22        21.    In the wake of these discoveries, GE and Woodward jointly interviewed

23   Liang on October 23, 2013.  During the interview, Liang initially denied downloading

24   a large number of files—until he was confronted with evidence of his bad acts.

25   Similarly, Liang initially denied the existence of the second USB device—before

26   ultimately conceding that he had in fact used two different USB devices to facilitate

27   his downloading activity (which he characterized as "a habit").  Liang additionally

28   admitted that he was aware that his access to GE resources was due to expire in mid-

1    November, 2013.  This correlates to a substantial increase in his file download activity

2    between October 7 and 21, 2013.

3         22.    During the course of this interview, Liang also conceded that he had

4    accessed and downloaded "tens of thousands of files" and "looked at" at least 50; that

5    in his opinion, these were "pretty bad" actions and he "kn[e]w it [was] wrong" to

6    download the files; and that he was aware that he "didn't have the legal right to obtain"

7    many of the files that he accessed and downloaded.

8         23.    Liang also admitted that he has multiple personal email accounts—

9    including two Yahoo! accounts, one Gmail account, and one MIT alumni account—as

10   well as a Facebook account (through which he sends messages to other Facebook users

11   by his own admission).  He further revealed that he does "have a Google drive," and

12   claimed that he "may have used it once or twice" when he "was transferring files on

13   test procedure to review at home."

14        24.    Liang was asked to return to the Duarte Facility to complete the interview

15   on the following day (October 24).  When he returned on the morning of October 24,

16   he refused to cooperate or answer any further questions and told a GE representative

17   that he was now represented by counsel.  As he was leaving the Duarte Facility, he

18   again admitted that he "kn[e]w what [he] did was bad," and asked one of GE's

19   Corporate IP Protection Center Leaders for "help" in avoiding fallout from his actions.

20   **GE'S Consistent and Unambiguous Efforts To Safeguard the Secrecy And Value**

21   **of Its Intellectual Property.**

22        25.    Founded in 1892, GE is a publicly-traded[3] American multinational

23   corporation that provides capital, expertise and infrastructure for a global economy.

24   GE currently operates through several divisions, including GE Capital, GE Power &

25   Water, GE Oil & Gas, GE Aviation, GE Healthcare, GE Transportation, GE Energy

26   Management, and GE Home & Business Solutions. Through these core businesses, GE

27   ---

[3]  GE was one of the original twelve companies listed on the then-newly-formed Dow Jones
Industrial Average in 1896; as of 2013, it remains the only one of these original companies still
listed on the Dow index.

28

1    has established itself as an innovative industry leader across a wide array of markets,

2    including (but not limited to) the generation, transmission and distribution of

3    electricity (*e.g.*, nuclear, gas and solar); lighting; medical imaging equipment; motors;

4    railway locomotives; aircraft jet engines; and aviation services.

5        26.    GE Capital has provided billions of dollars in financing so that businesses

6    can build and grow their operations and consumers can build their financial futures.

7    And various GE businesses build appliances, lighting, power systems and other

8    products that help millions of homes, offices, factories and retail facilities around the

9    world work better.  Annually, GE invests more than $10 billion to launch new products

10   and build global capabilities.  A cornerstone of GE's ability to bring such innovation to

11   consumers on a global scale is its intellectual property, which has been cultivated over

12   a century of research and development through the ingenuity of honest and

13   hardworking GE employees.

14       27.    To assist in this ongoing company-wide effort, each of GE's businesses

15   maintains electronic libraries (GE Libraries) containing confidential, proprietary and/or

16   trade secret information concerning business operations, research, technology,

17   marketing, and a variety of other subjects.  GE Libraries include a GE network

18   database called the GE SupportCentral Library.  These libraries thus act as a virtual

19   warehouse of information that individuals working within a relevant business unit may

20   contribute to and/or access within their specific business units for the sole purpose of

21   performing their duties.  To safeguard the contents of SupportCentral (and other online

22   GE resources), GE employees may access it and the company's other internal web

23   sites only through the use of their SSO (a secure sign on with a unique ID) and

24   password.  For security purposes, a SSO allows a user to set his or her own SSO

25   Password.  The SSO Password is a combination of letters, embedded numbers and

26   special characters that the user may reset only by answering three Challenge

27   Responses that s/he establishes.

28

28.     As an additional layer of protection for the documents and files uploaded to its SupportCentral Library (and other GE documents), GE also requires its employees to abide by Data Classification Guidelines that divide all such documents and files into four categories:  "Public," "GE Internal," "GE Confidential," and "GE Restricted."  Under this classification system, documents falling into *any* of the last three categories are "not for disclosure to the public or external parties."  Documents classified as "GE Confidential" are intended for intra-Company use on a "need-to-know" basis only, and documents classified as "GE Restricted" (containing information that is "extremely sensitive or private" and "of highest value to the Company") are intended for intra-Company use "by named individuals *only*."

29.     The GE Data Classification Guidelines are just one example of GE's ongoing efforts to educate its employees regarding the protection of GE Intellectual Property—and to safeguard the same.  Another example is GE's Code of Business Conduct & Ethics, which Liang signed and, by so doing, expressly acknowledged receipt of GE's The Spirit And The Letter ("S&L") brochure.  (Exh. A.)  S&L is a GE compliance guideline applicable to all GE employees, which unambiguously states that "*[a]ll* employees must work to safeguard [GE] patents, trademarks, copyrights, trade secrets and other proprietary information." (Exh. B, at 50, emphasis added.)

30.     GE also consistently requires its employees to enter into agreements and abide by other policies that clearly and specifically limit the rights of GE employees to access or use GE Intellectual Property.[4]  For example, on August 15, 2011, Liang— then an Engineering Technical Lead within GE Aviation—entered into a GE Proprietary Information & Invention Agreement ("PIIA"), which categorically forbids employees from "*disclos[ing] or us[ing], either during or after the term of th[e] Agreement,* any Propriety Information known to [them] as a result of [their]

---

[4]  The GE Policies described in Paragraphs 27-34 of this Complaint shall be collectively referred to herein as "GE IP/IR Policies."

employment except as required in [their] work" for GE "or as authorized in writing by" GE. (Exh. C, emphasis added.) The PIIA defines "Proprietary Information" as

> information not generally known outside GE Aviation or information entrusted to any member of GE Aviation by third parties. This information may relate, for example, to inventions, computer technology and programming, research, development, engineering, manufacturing, purchasing, accounting, marketing or selling. The information may be contained in materials such as drawings, models, data specifications, reports, compilations, or computer programs, or may be in the nature of unwritten knowledge or know-how.

(Id.) Pursuant to the PIIA, "[a]ll Proprietary Information which [the employee] conceive[s] or develop[s], either alone or with others, during the term of th[e] Agreement shall be the exclusive property" of GE. Additionally, the PIIA requires all employees to "deliver to [GE] all materials in [their] possession which contain Proprietary Information" upon their departure from the Company. (Id.)

31.    Liang also entered into a written "Employee Innovation and Proprietary Information Agreement" ("EIPIA") (Exh. D) with GE.[5] Similar to the PIIA (above), under the EIPIA, Liang is prohibited from "us[ing], publish[ing] or otherwise disclos[ing] (except as my Company duties [required]), *either during or subsequent to my employment*, any secret or confidential information or data of the Company or its parent, subsidiaries or affiliates or any information or data of others that the Company or its parent, subsidiaries or affiliates are obligated to maintain in confidence." (Id. at 2; emphasis added.) Furthermore—and again, similar to the PIIA (above)—"upon [his] termination" Liang was additionally obligated under the EIPIA to *"deliver to the Company promptly all items that belong to the Company or its parent, subsidiaries or affiliates* or that by their nature are for the use of Company employees only, including, without limitation, all written and other *materials that are of a secret or confidential nature relating to the business of the Company or its affiliates."* (Id.; emphasis added.)

---

[5] Exhibit D comprises the entire EIPIA. While Mr. Liang's HR file, which GE received from Woodward, only included the signature page to the EIPIA, Woodward was able to locate the first two pages of the agreement in another file.

To ensure that the EIPIA was understood and followed—and specifically, to protect GE's trade secrets and other confidential information—the agreement explained that:

> The Company generally considers 'secret' or 'confidential' any information or data that is not generally known - regardless of whether such information or data is in oral, written, machine readable or other form.  When in doubt, you should assume that information or data is secret or confidential unless or until determined otherwise.  Without limitation, examples of information or data that may be of a secret or confidential nature are: drawings, manuals, notebooks, reports, models, inventions, formulas, processes, machines, compositions, computer programs, accounting methods, business plans, information systems, customer and employee lists and any information and data in electronic form.

(Exh. D at 3; emphasis in original.)

32.    In fact, each time that Liang logged on to the GE computer in his possession, he was reminded that GE's "computer system may be accessed and used only by GE employees and other authorized personnel and for legitimate business purposes and in accordance with applicable GE policies and guidelines."  (Exh. E.)  He also was reminded to "review the Acceptable Use Guidelines ["AUGIR"] at http://supportcentral.ge.com/*AUG."  (*Id.*)  These guidelines provide that GE employees may only access "GE Information" if that information is "necessary to perform [their] current job responsibilities"—and even where such access is justified, any information so obtained may only be utilized "for legitimate [GE] business purposes and in a manner consistent with the purpose for which the information was initially collected or created." (Exh. F, at 3).  "GE Information" is broadly defined by the AUGIR to include:

> all information that is collected or created by the Company, and by you in your GE role—regardless of whether you are working from the office, home or while traveling, and regardless of whether you are working on a GE, personal or third party site or device. ... GE Information also includes information GE creates in

1    its business processes, such as trade-controlled information, intellectual property

2    and financial information.

3    (*Id.* at 2.)  Pursuant to AUGIR, GE employees may only access "GE Information" that

4    they have a legitimate 'need to know' in order to perform their job, and may only share

5    "GE Information" with "authorized persons who have a legitimate 'need to know' in

6    order to perform their job responsibilities."  (*Id.* at 3.)  The AUGIR unequivocally

7    states that all "GE information belongs to the company and may not be copied or

8    otherwise removed unless permitted for a legitimate [GE] business reason."  (*Id.*)

9        33.    AUGIR also prohibits the misuse of "GE Information Resources," which

10   are defined to include, but are not limited to "GE Information and equipment and

11   technology provided by GE to process and store GE Information" such as "computer

12   equipment ... Internet access, email accounts, GE network access, personal data

13   assistants ("PDAs") (e.g, BlackBerries), cellphones and software provided by the

14   Company."  (*Id* at 2.)  The policy declares that:

15       Portable devices containing GE Information, including laptops, cell phones and
         PDAs (e.g., BlackBerries) must be secured at all times. ... Laptops must be
16       encrypted and physically secured, even in a GE location. GE network access for
         personally purchased portable or mobile devices must be approved by your
17       business; once granted GE network access, these personally owned devices will
         be treated as GE Information Resources with respect to approved business-
18       related use, and the device owner becomes responsible for understanding and
         complying with relevant terms of service.
19
         Removable media (e.g., USB drives, external hard drives, CDs/DVDs) should
20       not be used to store GE Confidential or GE Restricted information unless such
21       devices are encrypted. Personally purchased removable media are not permitted
         for business use unless expressly permitted by your business.
22

23

24   (*Id.* at 4.)  AUGIR also expressly requires those subject to the policy to "ONLY USE

25   GE REMOVABLE MEDIA for business purposes" and "not [to] use personal

26   devices," and to "RETURN GE Information Resources when they are no longer in

27   use." (*Id.*)  Finally, the policy prohibits "ENGAGING IN NON-GE BUSINESS

28   ACTIVITIES with GE Information Resources" and the "USE OF PERSONAL

                                        13

1  EMAIL ACCOUNTS (e.g., Yahoo, Gmail) or calendar systems to conduct GE
2  business." (*Id*. at 5.)

3  34.    Liang additionally was subject to and aware of GE's Internet Policy, which
4  addresses, among other things, "data protection" and pursuant to which "[e]mployees
5  are required to conduct themselves honestly and appropriately on the Internet and
6  respect the copyrights, software licensing rules, property rights, privacy and
7  prerogatives of others." (Ex. G at 1.)

8
9
                    **FIRST CLAIM FOR RELIEF**

**Violation of Federal Computer Fraud and Abuse Act**
10                **(18 U.S.C. §§ 1030(a)(2)(C), (a)(4) & (a)(5))**
                **(Against Defendant Erwin Wenti Liang)**
11

12  35.    GE incorporates by reference each of the allegations in the preceding
13  paragraphs 1-34 of this Complaint as though fully set forth herein.

14  36.    Defendant has violated the Computer Fraud and Abuse Act, 18 U.S.C. §
15  1030(a)(2)(C), by intentionally accessing a GE computer used in interstate or foreign
16  commerce or communication (a "protected computer"), without authorization and by
17  exceeding authorized access to such a computer (in violation of one or more GE IP/IR
18  Policies), and by obtaining information from such a protected computer.

19  37.    Defendant has violated the Computer Fraud and Abuse Act, 18 U.S.C.
20  § 1030(a)(4), by knowingly, and with intent to defraud GE, accessing a GE protected
21  computer, without authorization and by exceeding authorized access to such a
22  computer (in violation of one or more GE IP/IR Policies), and by means of such
23  conduct furthered the intended fraud and obtained one or more things of value,
24  including but not limited to GE Intellectual Property.

25  38.    Defendant has violated the Computer Fraud and Abuse Act, 18 U.S.C.
26  § 1030(a)(5)(B), by intentionally accessing GE's protected computers without
27  authorization and, as a result of such conduct, recklessly causing damage to GE.

28

14

39.     Defendant has violated the Computer Fraud and Abuse Act, 18 U.S.C. §
1030(a)(5)(C), by intentionally accessing GE's protected computers without
authorization and, as a result of such conduct, causing damage and loss to GE.

40.     The GE computer system or systems that Defendant accessed as described
above constitute a "protected computer" within the meaning of 18 U.S.C. § 1030(e)(2)
because it is used in interstate or foreign commerce or communication.

41.     GE has suffered damage and loss by reason of these violations, including,
without limitation, diminution in value of GE Intellectual Property; impairment to the
security and integrity of GE's systems; investigative and remedial time, labor, and
expenses; and other losses and damage in an amount to be proved at trial, but, in any
event, in an amount over $5,000 aggregated over a one-year period.

42.     Defendant's unlawful access to and copying from GE's computers have
caused GE irreparable injury, and GE's remedies at law are not adequate to
compensate it for these injuries, entitling GE to injunctive and other equitable relief, as
provided by 18 U.S.C. § 1030(g).

## SECOND CLAIM FOR RELIEF

### Violation of Comprehensive Computer Data Access and Fraud Act
### (Cal. Penal Code § 502)
### (Against Defendant Erwin Wenti Liang)

43.     GE incorporates by reference each of the allegations in the preceding
paragraphs 1-34 of this Complaint as though fully set forth herein.

44.     Defendant has violated California Penal Code § 502(c)(1) by knowingly
accessing and without permission using data, computer(s), computer system(s), or
computer network(s) in order to (a) to either (A) devise or execute a scheme or artifice
to defraud or deceive GE, or (b) wrongfully obtain property or data from GE.

45.     Defendant has violated California Penal Code § 502(c)(2) by knowingly
and fraudulently, and without permission, accessing, taking, copying, and/or making
use of data from a GE computer, computer system, or computer network, or taking or

copying supporting documentation from GE's computers, computer systems, and/or computer networks.

46.    Defendant has violated California Penal Code § 502(c)(3) by knowingly, fraudulently, and without permission accessing and using GE's computer services.

47.    Defendant has violated California Penal Code § 502(c)(6) by knowingly, fraudulently, and without permission providing, or assisting in providing, a means of accessing GE's computers, computer systems, and/or computer networks.

48.    Defendant has violated California Penal Code § 502(c)(7) by knowingly, fraudulently, and without permission accessing, or causing to be accessed, GE's computers, computer systems, and/or computer networks.

49.    GE owns certain materials comprised of GE Intellectual Property that have been obtained by Defendant as alleged above.

50.    As a direct and proximate result of Defendant's unlawful conduct within the meaning of California Penal Code § 502, Defendant has caused damage to GE in an amount to be proven at trial.  GE is also entitled to recover its reasonable attorneys' fees pursuant to California Penal Code § 502(e).

51.    GE is informed and believes that Defendant's acts were willful and malicious; GE is therefore entitled to punitive damages.

52.    GE has also suffered irreparable injury from these acts.  Due to the continuing threat of such injury, GE has no adequate remedy at law, and is entitled to injunctive relief.

### THIRD CLAIM FOR RELIEF

### Trade Secret Misappropriation (Cal. Civ. Code §§ 3426.1 *et seq.*)
### (Against All Defendants)

53.    GE incorporates by reference each of the allegations in the preceding paragraphs 1-34 of this Complaint as though fully set forth herein.

54. Numerous files and documents stored on GE's SupportCentral Library and Document Libraries contain GE trade secrets.  These confidential materials are a

1  valuable collection of data assembled over many years, by numerous GE employees,

2  that allow GE to compete effectively and advantageously, including because the

3  information is not generally known to others who, if they had access to the

4  information, could use it to compete against GE. Among these trade secrets are

5  documents reflecting GE New Product Initiatives ("NPI"); product research,

6  development, testing, and quality control; product technical specifications; product

7  pricing; strategy for various business segments, specific products and initiatives, and

8  customers; cost data; target market, industry, and customer information, including

9  research and analyses; financial models and projections; deal-specific financial

10  analyses and summaries; valuation data; internal assessments of strengths and

11  weaknesses of GE products; internal processes (*e.g.*, audit); and employee training

12  materials. Were competitors able to gain access to any of these documents (or others

13  like them), it would enable them to save substantial time and/or money in developing

14  competitive products and/or strategies and it would cause GE significant competitive

15  harm.

16      55.    GE takes extraordinary efforts to maintain the confidentiality of its files

17  and documents, including, without limitation, by (1) restricting access to GE's

18  Document Libraries and SupportCentral Library; (2) disclosing certain of these

19  materials only to clients or independent consultants pursuant to licenses or other

20  contracts with strict confidentiality provisions; (3) prohibiting disclosure of these

21  materials by employees pursuant to the various employment agreements and guidelines

22  set forth above in Paragraphs 27-34; (4) designating these materials as GE Internal, GE

23  Confidential (authorized intra-Company access limited on a "need-to-know" basis), or

24  GE Restricted (authorized intra-Company access limited to expressly "named

25  individuals" who are included on comprehensive internal lists); and/or (5) designating

26  these materials as confidential, proprietary, and/or trade secrets. In addition to the

27  documents described above in Paragraph 54, upon information and belief, another

28

1   exemplar document (unlawfully accessed and copied by Liang) from GE Healthcare is

2   marked as follows:

3       **CONFIDENTIAL & PRIVILEGED.  This document contains confidential**

4       **and privileged trade secrets and other information of GE Healthcare Corp.**

5       **and as such may not be disclosed to others not employed by GE Healthcare.**

6       **All rights reserved.**

7   These markings, and others like them, put Liang and others on notice that they had no

8   legitimate business purposes in accessing, disclosing, or using such documents, but

9   Liang downloaded them anyway.

10       56.    Upon information and belief, Defendants have misappropriated GE's

11   trade secrets by means they knew, or had reason to know, were improper, because

12   Defendants had no proper access or permission to acquire these materials and could

13   not reasonably have believed that they had such permission.  Indeed, Liang expressly

14   admitted that he knew what he did was "wrong."  *See supra*, ¶¶ 21-24.

15       57.    Upon information and belief, Defendants also misappropriated GE's trade

16   secrets by using and/or disclosing these trade secret materials without authorization.

17   Upon information and belief, Defendants knew or had reason to know at the time of

18   their use and/or disclosure of GE's trade secret information that Defendants'

19   knowledge of the information was (1) derived from or through a person who had

20   employed improper means to acquire those trade secrets from SupportCentral Library

21   (*e.g.*, Liang); (2) acquired under circumstances giving rise to a duty to maintain the

22   secrets' secrecy or to limit their use, including but not limited to using an employee-

23   restricted credential (*e.g.*, Liang); and/or (3) derived from or through a person who

24   owed a duty to GE to maintain the secrets' secrecy or limit their use (*e.g.*, Liang).

25       58.    GE has suffered actual losses caused by Defendants' misappropriation of

26   its trade secrets in an amount to be proved at trial.  In addition, GE is entitled to the

27   benefits by which Defendants were unjustly enriched by misappropriating GE's trade

28   secret information.

59.    Defendants' misappropriation of GE's trade secrets was willful and malicious, entitling GE to exemplary damages and its attorneys' fees and costs.

60.    Defendants' misappropriation of GE's trade secrets has also caused GE irreparable injury, and GE's remedies at law are not adequate to compensate it for these inflicted and threatened injuries, entitling GE to injunctive relief.  Furthermore, on information and belief, GE alleges that Liang's misappropriation is still ongoing at this time.  Although Liang no longer has continuing access to GE internal resources such as GE's SupportCentral Library, as set forth above in Paragraphs 15-24 he has shown himself to be a technologically sophisticated party.  Moreover, Liang has ignored GE's repeated requests to return such information and/or to allow GE to perform an inspection to confirm that Liang no longer possesses such materials.  Accordingly, GE believes that some of the misappropriated files remain in his or his agents/co-conspirators' possession, custody, or control. GE has reason to believe that these copies may currently be hosted—and thus could be further copied or readily disseminated to additional parties—through channels including, but not limited to, Liang's numerous personal email accounts; Liang's Facebook account; and/or a possible cloud-based storage account.  Accordingly, immediate injunctive relief is appropriate under these circumstances.

## FOURTH CLAIM FOR RELIEF

### Breach of Contract
### (Against Defendant Erwin Wenti Liang)

61.    GE and GE Aviation incorporate by reference each of the allegations in the preceding paragraphs 1-34 of this Complaint as though fully set forth herein.

62.    As set forth above in Paragraphs 30-31, Liang entered into the written EIPIA and PIIA with GE and GE Aviation, respectively (Exhs. D and C).  Under these agreements, Liang was required to refrain from "us[ing], publish[ing] or otherwise disclos[ing] (except as my Company duties [required]), *either during or subsequent to my employment*, any secret or confidential information or data of the Company or its

parent, subsidiaries or affiliates or any information or data of others that the Company or its parent, subsidiaries or affiliates are obligated to maintain in confidence." (Exh. D (EIPIA) at 2, emphasis added; *see* Exh. C (PIIA).)  Furthermore, "upon [his] termination" Liang was additionally obligated under these agreements to "deliver to the Company all items that belong to the Company or its parent, subsidiaries or affiliates or that by their nature are for the use of Company employees only, including, without limitation, all written and other materials that are of a secret or confidential nature relating to the business of the Company or its affiliates." (*Id.*)

63.   Additionally, in signing the EIPIA, Liang "acknowledge[d] that breach of any obligation or other provision of this agreement may cause irreparable injury to the Company which cannot be fully compensated by money." (Exh. D at 2.)  Accordingly, he "hereby agree[d] that in the event of any breach . . . of this agreement by me, the Company shall be entitled to injunctive or other equitable relief as may be permitted by law." (*Id.*)

64.   As detailed above, Liang was neither required within the lawful scope of his job as an Engineering Technical Lead at GE Aviation, nor at any other time otherwise authorized by GE or GE Aviation (in writing or otherwise), to "disclose" or "use" the tens of thousands of files that he improperly accessed and copied from the GE SupportCentral Library and other GE electronic resources.  Accordingly, Liang's known use of these files for non-GE business reasons and for his own personal gain— as well as any disclosures of them that he has made or may make to third parties— constitutes a breach of contract under both the EIPIA and PIIA.

65.   Furthermore, to the extent that Liang's unlawful downloading activities commenced prior to December 28, 2012, Liang's failure to return all files that he had unlawfully copied prior to December 28, 2012—and, more generally, his failure to return *any and all* GE Proprietary Information that was in his possession as of December 28, 2012, whether lawfully obtained or not—constitutes a second and independent breach of contract under both the PIIA and the EIPIA.

66.     As a direct and proximate result of the aforementioned breaches of the PIIA and the EIPIA, Liang has caused damage to GE in an amount to be proven at trial.  Furthermore—as expressly permitted under the EIPIA—GE hereby requests injunctive and/or other equitable relief as appropriate to prevent any irreparable or ongoing injury stemming from breaches that occurred thereunder.

## FIFTH CLAIM FOR RELIEF

### Conversion
### (Against Defendant Erwin Wenti Liang)

67.     GE incorporates by reference each of the allegations in the preceding paragraphs 1-34 of this Complaint as though fully set forth herein.

68.     At all relevant times, GE was, and still is, the rightful owner of the files and documents unlawfully accessed and downloaded and/or copied by Liang.

69.     Despite GE's demand to Liang for repossession of all of its files, Defendant has failed to return possession of the files to GE.  Accordingly, Liang has converted certain files from GE in the process of accessing and/or downloading (some of which GE no longer has in its possession as true, correct, and complete versions).

70.     As a direct and proximate result of Defendant's unlawful conversion of the aforementioned files, Defendant has caused damage to GE in an amount to be proven at trial.

71.     GE is informed and believes that Defendant's conversion of the aforementioned files was willful and malicious, and accordingly GE is entitled to exemplary and punitive damages from Defendant in a sum according to proof.

## SIXTH CLAIM FOR RELIEF

### Unfair Competition (Cal. Bus. & Prof. Code § 17200 et seq.)
### (Against Defendant Erwin Wenti Liang)

72.     GE incorporates by reference each of the allegations in the preceding paragraphs 1-52 of this Complaint as though fully set forth herein.

73.     Defendant's conduct described above constitutes unlawful, unfair, or fraudulent business acts or practices in violation of Section 17200 of the California Business and Professions Code.

74.     Defendant's conduct is unlawful because it violates at least the Federal Computer Fraud and Abuse Act (18 U.S.C. §§ 1030(a)(2)(C), (a)(4) & (a)(5) and the Comprehensive Computer Data Access and Fraud Act (Cal. Penal Code § 502). Defendant's business practices in unlawfully accessing and downloading and/or copying GE's intellectual property also clearly constitute unfair, fraudulent, and/or deceitful conduct under the California's Unfair Competition Law—and furthermore, such acts are unethical, oppressive, or unscrupulous, and certainly cause injury to competition and consumers that outweighs any conceivable lawful benefits (of which GE is aware of none).

75.     Defendant's conduct is also patently "unfair" for reasons that are almost too obvious to state: permitting parties to misappropriate protected corporate Intellectual Property from a secure corporate database through their unauthorized use of a corporate computer, log-in and system would violate the letter, spirit, and policies that undergird IP protection and destroy the most basic distinctions between public and private property. (As Liang himself recognized, what he did was simply "wrong"— see ¶ 22.)

76.     By reason of Defendant's violations of California's Unfair Competition Law, GE has been injured in its business or property, including by incurring damages for the costs of uncovering, investigating, and documenting Defendant's misconduct; the costs of filing this suit; the loss of past, present, and future profits; and serious prospective harm that may be inflicted on all affected businesses. GE asserts this claim for unfair competition in its own name only, and does not act for the interest of any other person or entity or for the general public.

77.     GE has suffered irreparable injury by reason of the acts, practices, and conduct of Defendant as described above, and will continue to suffer such injury

22

1  unless and until the Court enjoins such acts, practices, and conduct.  GE has no

2  adequate remedy at law.

3  ## **PRAYER FOR RELIEF**

4      WHEREFORE, GE and/or GE Aviation respectfully prays for the following:

5      A.     For preliminary and permanent injunction ordering Defendants, their

6  officers, agents, servants, employees, and attorneys, and those in active concert or

7  participation with any of them, to immediately:

8          (1)     return all confidential, proprietary GE materials and GE trade

9  secrets that are in their possession, custody, or control;

10          (2)     cease further access to, disclosure, copying, or use or otherwise

11  profiting from the confidential, proprietary and/or trade secret information contained in

12  the files that Liang wrongfully and illegally accessed, copied, and/or downloaded from

13  GE's password-protected internal website to prevent the ongoing misappropriation of

14  GE's trade secrets;

15          (3)     preserve all documents that are relevant to the parties' claims or

16  defenses or that are likely to lead to the discovery of admissible evidence; and

17          (4)     otherwise cease violating the Computer Fraud and Abuse Act, the

18  California Comprehensive Computer Data Access and Fraud Act, and/or the California

19  Uniform Trade Secrets Act;

20      B.     For an Order directing Defendants to file with the Court and serve on GE

21  within thirty (30) days after the service on Defendants of such injunction a report in

22  writing, under oath, setting forth in detail the manner and form in which Defendants

23  have complied with the injunction;

24      C.     For an Order directing Defendants to return GE's property—including,

25  without limitation, GE's confidential, proprietary, and/or trade secret materials—as set

26  forth in this Complaint;

27

28

D.   For an Order authorizing full expedited discovery in this proceeding to ensure full compliance with the aforementioned Orders, and to quickly enable GE to understand the scope of Liang's conduct;

E.   For an Order restraining Defendants or their officers, agents, servants, employees, and attorneys from destroying any and all files or documents wrongfully obtained from GE that are currently in their possession;

F.   For damages, including actual damages to GE and GE Aviation and disgorgement of Defendants' profits attributable to their unjust enrichment and wrongful acts, to be proven at trial or alternatively payment of reasonable royalty under Cal. Civ. Code § 3426.3;

G.   For punitive and/or exemplary damages;

H.   For prejudgment interest;

I.   For an Order awarding GE its attorneys' fees and costs; and

J.   For an Order awarding GE such other and further relief as the Court deems just and proper.

DATED:  November 24, 2013

Gibson, Dunn & Crutcher LLP

By: _____

Scott A. Edelman
Attorneys for Plaintiffs
General Electric Company and
GE Aviation Systems LLC

24

## **DEMAND FOR JURY TRIAL**

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs General Electric Company and GE Aviation demand a trial by jury on all issues triable by a jury.

DATED: November 24, 2013

Gibson, Dunn & Crutcher LLP

By: _Scott A. Edelman_

Scott A. Edelman
Attorneys for Plaintiffs
General Electric Company and
GE Aviation Systems LLC

101624440.13

25

# EXHIBIT A

## CODE OF BUSINESS CONDUCT & ETHICS

I acknowledge that I have received GE's "The Spirit & The Letter" brochure which contains GE's Statement of Integrity and Code of Conduct., etc.

### GE Code of Conduct

Obey the applicable laws and regulations governing our business conduct worldwide.

- Be honest, fair and trustworthy in all your GE activities and relationships.
- Avoid all conflicts of interest between work and personal affairs.
- Foster an atmosphere in which fair employment practices extend to every member of the diverse GE community.
- Strive to create a safe workplace and to protect the environment.
- Through leadership at all levels, sustain a culture where ethical conduct is recognized, valued and exemplified by all employees.

The above reflects dedication to a policy which supports fair dealing and honesty, because such behavior is morally and legally right and because business success and reputation for integrity depends on the action taken consistent with sound policies.

I agree that I will be held accountable for abiding to these initiatives during my employment. Violation of the above may constitute disciplinary action up to and including termination.

_____          Erwin Liang          8/15/2011
Employee Signature                  Printed Employee Name      Date

Form 08-024 (3/08)

Ex. A
P. 26

# EXHIBIT B

Always with unyielding integrity

# The Spirit
# & The Letter



## CONTENTS

1   STATEMENT OF INTEGRITY

2   THE SPIRIT & THE LETTER:
    GUIDING THE WAY WE DO BUSINESS

3   GE CODE OF CONDUCT

4   YOUR PERSONAL COMMITMENT

5   WHO MUST FOLLOW GE
    COMPLIANCE POLICIES

6   WHAT EMPLOYEES MUST DO

7   WHAT LEADERS MUST DO

8   RAISE YOUR VOICE:
    YOUR OBLIGATION TO RAISE
    INTEGRITY CONCERNS

9   HOW TO RAISE AN INTEGRITY CONCERN

10  WHAT HAPPENS WHEN AN INTEGRITY
    CONCERN IS RAISED

11  PENALTIES FOR VIOLATIONS

12  BUSINESS POLICIES AND PROCEDURES

13  THE SPIRIT & THE LETTER POLICIES

14  REGULATORY EXCELLENCE

16  WORKING WITH CUSTOMERS & SUPPLIERS
18  Improper Payments
20  Supplier Relationships
24  International Trade Controls
26  Money Laundering Prevention
28  Privacy

30  GOVERNMENT BUSINESS
32  Working with Governments

34  COMPETING GLOBALLY
36  Complying with Competition Laws

38  IN THE GE COMMUNITY
40  Fair Employment Practices
44  Environment, Health & Safety
46  Security & Crisis Management

48  PROTECTING GE ASSETS
50  Intellectual Property
52  Controllership
56  Conflicts of Interest
58  Insider Trading & Stock Tipping

60  INDEX

61  APPENDIX: WHICH LAW APPLIES

This booklet is just an introduction to GE compliance policies.
The full text of those policies and many other resources are
located at **integrity.ge.com**.

1

**Statement of integrity**

For more than 125 years, GE has demonstrated an unwavering commitment to performance with integrity. At the same time we have expanded into new businesses and new regions and built a great record of sustained growth, we have built a worldwide reputation for lawful and ethical conduct.

This reputation has never been stronger. In several surveys of CEOs, GE has been named the world's most respected and admired company. We have been ranked first for integrity and governance.

But none of that matters if each of us does not make the right decisions and take the right actions. At a time when many people are more cynical than ever about business, GE must seek to earn this high level of trust every day, employee by employee.

This is why I ask each person in the GE community to make a personal commitment to follow our Code of Conduct. This set of GE policies on key integrity issues guides us in upholding our ethical commitment. All GE employees must comply not only with the letter of these policies, but also their spirit.

If you have a question or concern about what is proper conduct for you or anyone else, promptly raise the issue with your manager, a GE ombudsperson or through one of the many other channels the Company makes available to you. Do not allow anything—not "making the numbers," competitive instincts or even a direct order from a superior—to compromise your commitment to integrity.

GE leaders are also responsible not only for their own actions but for fostering a culture in which compliance with GE policy and applicable law is at the core of business-specific activities. Leaders must address employees' concerns about appropriate conduct promptly and with care and respect.

There is no conflict between excellent financial performance and high standards of governance and compliance—in fact, the two are mutually reinforcing. As we focus on becoming the pre-eminent growth company of the 21st century, we must recognize that only one kind of performance will maintain our reputation, increase our customers' confidence in us and our products and services, and enable us to continue to grow, and that is performance with integrity.

*Jeff Immelt*

**Jeffrey R. Immelt**
Chairman of the Board & Chief Executive Officer
June 2005

**Ex. B**
**P. 29**

# The Spirit & The Letter: guiding the way we do business

Every day, everyone at GE has the power to influence our company's reputation—everywhere we do business. The Spirit & The Letter helps to ensure that, after more than 125 years, we still conduct our affairs with unyielding integrity.

For well over a century, GE employees have worked hard to uphold the highest standards of ethical business conduct. We seek to go beyond simply obeying the law—we embrace the spirit of integrity.

GE's Code of Conduct articulates that spirit by setting out general principles of conduct everywhere, every day and by every GE employee.



Ex. B
P. 30

# GE code of conduct

## Obey the applicable laws and regulations governing our business conduct worldwide.

Be honest, fair and trustworthy in all your GE activities and relationships.

...........

Avoid all conflicts of interest between work and personal affairs.

...........

Foster an atmosphere in which fair employment practices extend to every member of the diverse GE community.

...........

Strive to create a safe workplace and to protect the environment.

...........

Through leadership at all levels, sustain a culture where ethical conduct is recognized, valued and exemplified by all employees.

...........

4  **The Spirit & The Letter**

# Your personal commitment

You will be asked to acknowledge your awareness that every GE employee must follow The Spirit & The Letter Policies and raise concerns about possible violations of law or policy with a GE manager, company legal counsel, GE auditor, GE ombudsperson or other GE compliance specialist.

For the complete text of policies, visit the GE integrity Web site: **integrity.ge.com**.

5

# Who must follow GE compliance policies

**GE DIRECTORS, OFFICERS AND EMPLOYEES**

**SUBSIDIARIES AND CONTROLLED AFFILIATES** Entities in which GE owns more than 50 percent of the voting rights, or has the right to control the entity, are required to adopt and follow GE compliance policies.

**NON-CONTROLLED AFFILIATES** Non-controlled affiliates should be encouraged to adopt and follow GE compliance policies.

**THIRD PARTIES REPRESENTING GE** GE employees working with third parties, such as consultants, agents, sales representatives, distributors and independent contractors, must:

- Require these parties to agree to comply with relevant aspects of GE's compliance policies.

- Provide these parties with education and information about policy requirements.

- Take action, up to and including terminating a contract, after learning that a third party failed to abide by GE's compliance policies.

Ex. B
P. 33

6  **The Spirit & The Letter**

# What employees must do

All employees can contribute to GE's culture of compliance by understanding GE's policies, embracing GE's commitment to integrity and acting to enforce compliance and avoid violations.

Employee responsibilities are as follows:

**UNDERSTAND GE POLICIES**

- Gain a basic understanding of the policy requirements summarized in this booklet.
- Learn the details of policies relevant to your job.
- Check **integrity.ge.com** for the complete and up-to-date policies.
- Go to your manager, company legal counsel or other GE resources with any questions about the policies.

**RAISE YOUR CONCERNS**

- Promptly raise any concerns about potential violations of any GE policy.
- Understand the different channels for raising integrity concerns: ombudsperson, manager, GE lawyer, GE auditor or other compliance resource.
- If a concern you raise is not resolved, pursue the issue! Raise it through another of GE's channels.
- Cooperate in GE investigations related to integrity concerns.

7

# What leaders must do

A leader must: create a culture of compliance in which employees understand their responsibilities and feel comfortable raising concerns without fear of retaliation; encourage ethical conduct and compliance with the law by personally leading compliance efforts; consider compliance efforts when evaluating and rewarding employees; and ensure that employees understand that business results are never more important than ethical conduct and compliance with GE policies.

Leaders must also take the following steps to build an infrastructure to prevent, detect and respond to compliance issues:

**PREVENT COMPLIANCE ISSUES**

- Identify business compliance risks.
- Ensure that processes, tailored to address your particular risk areas, are communicated and implemented.
- Provide education on GE policies and applicable law to employees and (where appropriate) board members and third parties.
- Commit adequate resources to your business's compliance program.

**DETECT COMPLIANCE ISSUES**

- Implement control measures, such as "dashboards" and "scorecards," to detect heightened compliance risks and/or violations.
- Promote an effective ombudsperson system.
- Ensure that periodic compliance reviews are conducted, with the assistance of business compliance leaders and/or the Corporate Audit Staff.

**RESPOND TO COMPLIANCE ISSUES**

- Take prompt corrective action to fix identified compliance weaknesses.
- Take appropriate disciplinary action.
- Consult with GE legal counsel and make appropriate disclosures to regulators and law enforcement authorities.

8  The Spirit & The Letter

# Raise your voice: your obligation to raise integrity concerns

Raising an integrity concern protects the GE community: our company, our colleagues and our stakeholders.

If you have a concern about compliance with GE policy, you have a responsibility to raise that concern.

**RAISE CONCERNS EARLY**
The longer we wait to address a concern, the worse it may become.

**YOU MAY REMAIN ANONYMOUS**
However, if you identify yourself, we are able to follow up with you and provide feedback.

**CONFIDENTIALITY IS RESPECTED**
Your identity and the information you provide will be shared only on a "need-to-know" basis with those responsible for resolving the concern.

**RETALIATION VIOLATES GE POLICY**
GE absolutely prohibits retaliation against anyone for raising or helping to address an integrity concern. Retaliation is grounds for discipline up to and including dismissal.

**You can raise a concern orally or in writing.
If you prefer, you can do it anonymously.**

Ex. B
P. 36

9

# How to raise an integrity concern

GE offers several channels for raising concerns. Use the channel that is most comfortable for you.

**WITHIN YOUR BUSINESS**

Generally, your supervisor or manager will be in the best position to resolve an integrity concern quickly. However, your direct supervisor is not your only option. Other resources include:

- Your compliance leader or auditor
- Company legal counsel
- Next level of management
- Your business ombudsperson or integrity helpline (listed at **integrity.ge.com**)

**GE CORPORATE OMBUDSPERSON**

The GE Ombudsperson process allows you to voice your integrity questions and concerns, anonymously if you choose, and you will receive a response.

P.O. Box 911
Fairfield, CT 06430
U.S.A.

800-227-5003 (U.S.A. only) or
8*229-2603 or (1) 203-373-2603
**ombudsperson@corporate.ge.com**

**GE BOARD OF DIRECTORS**

You may report concerns about GE's accounting, internal accounting controls or auditing matters, as well as other concerns, to the Board of Directors or the Audit Committee.

GE Board of Directors
General Electric Company (W2E)
3135 Easton Turnpike
Fairfield, CT 06828 U.S.A.

800-417-0575 (U.S.A. only)
(1) 203-373-2652
**directors@corporate.ge.com**

**Speak up, ask questions, get answers. If your concern is not addressed, raise it to one of the other channels.**

Ex. B
P. 37

10  The Spirit & The Letter

# What happens when an integrity concern is raised

Concerns about compliance with GE policy will be investigated. GE's investigation process includes:

**1. ASSIGNING AN INVESTIGATION TEAM**
Experts with the right knowledge and objectivity are assigned to investigate.

**2. CONDUCTING AN INVESTIGATION**
The team determines the facts through interviews and/or review of documents.

**3. CORRECTIVE ACTION**
If necessary, the team recommends corrective actions to the appropriate managers for implementation.

**4. FEEDBACK**
The person raising the concern receives feedback on the outcome.

# Penalties for violations

Employees and leaders who violate the spirit or letter of GE's policies are subject to disciplinary action up to and including termination of employment. Misconduct that may result in discipline includes:

- Violating GE policy.
- Requesting others to violate GE policy.
- Failure to promptly raise a known or suspected violation of GE policy.
- Failure to cooperate in GE investigations of possible policy violations.

- Retaliation against another employee for reporting an integrity concern.
- Failure to demonstrate leadership and diligence to ensure compliance with GE policies and law.

# GE absolutely prohibits retaliation

12  The Spirit & The Letter

# Business policies and procedures

Your business may issue its own policies and procedures.
You must follow those policies and procedures in addition to
those described in this guide.

**IMPORTANT** This guide and the policies described in it are not an
employment contract. GE does not create any contractual rights
by issuing this guide or the policies.

Introduction: Regulatory excellence
Working with customers & suppliers
Government business
Competing globally
In the GE community
Protecting GE assets

# The Spirit
# & The Letter
# policies

14  The Spirit & The Letter

# Regulatory excellence

Virtually all of our *Spirit & Letter* policies are based on government laws and regulations. These regulations impact every GE business and every GE employee. Regulators establish and define the rules that we must comply with to conduct business. Effectively engaging with regulators as they establish regulations and assuring compliance with these regulations are critical to maintaining GE's reputation for integrity.

Today's regulatory environment is becoming more and more challenging. GE is subject to a growing number of regulations and enforcement activities around the world. This environment demands that every employee and leader be aware, knowledgeable and committed to regulatory excellence.

15

## RESPONSIBILITIES OF ALL EMPLOYEES

- Be knowledgeable about and comply with the *Spirit & Letter* policies that affect your job responsibilities.

- Be aware of the specific regulatory requirements of the country and region where you work and that affect your business.

- Gain a basic understanding of the key regulators (who they are) and the regulatory priorities (what they require) that affect your business and your work.

- Promptly report any red flags or potential issues that may lead to a regulatory compliance breach.

- Always treat regulators professionally, with courtesy and respect.

- Assure that you coordinate with business or corporate experts when working with or responding to requests of regulators.

## RESPONSIBILITIES OF ALL LEADERS

Leaders have the following special responsibilities for regulatory compliance:

**LEAD**
- Assure that you and your team are engaged in addressing regulatory policy, meeting regulatory requirements and managing regulatory risks.
- Embed regulatory requirements into key operating processes. (e.g., Growth Playbook, Session C and Session D)

**ASSESS**
- Determine the key regulators and regulatory requirements that affect your business operations globally.

**RESOURCE**
- Assign owners for all regulatory risk areas and assure that they coordinate with any relevant government relations and corporate regulatory specialists.
- Confirm that the right domain expertise exists to effectively manage regulatory relationships and compliance.

**ANTICIPATE**
- Implement effective processes that alert you to new and changing regulations. Include regulation in your risk assessments.

**RELATE**
- Develop and maintain effective relationships with regulators in coordination with government relations and compliance experts.
- Work proactively with regulators on the development of regulations that achieve policy objectives efficiently and effectively.

**CONTROL**
- Monitor execution and conduct audits to assure that processes which support regulatory relationships and compliance are operating effectively.

Section One

Improper payments
Supplier relationships
International trade controls
Money laundering prevention
Privacy

# Working with customers & suppliers

17

An overseas customer has been invited
to travel to visit our training facility at GE
expense, but also wants to add a weekend
side trip to visit Universal Studios.

**Can we fund the whole trip?**

**SEE PAGE 18:**
**IMPROPER PAYMENTS**



Working with
customers & suppliers

Your low-cost supplier offers
good quality and reliable delivery
at prices that can't be beat.
But you are uncomfortable with
the working and living conditions
it provides its workers.

**Shrug it off, or make
an issue of it?**

**SEE PAGE 20:**
**SUPPLIER RELATIONSHIPS**

Ex. B
P. 45

18   The Spirit & The Letter

# Improper payments

**WHAT TO KNOW**

An improper payment to gain advantage in any situation is never acceptable and exposes you and GE to possible criminal prosecution. GE expressly prohibits improper payments in all business dealings, in every country around the world, with both governments and the private sector.

Improper payments should not be confused with reasonable and limited expenditures for gifts, business entertainment and customer travel and living expenses directly related to the promotion of products or services or the execution of a contract. These payments are acceptable, subject to specific GE corporate and business guidelines.

❓ **ANSWER TO QUESTION ON PAGE 17** It depends on many factors, including whether your customer is a government official, the local law, the customer's policies, your business's guidelines and other facts. You must consult with GE counsel and your manager to determine whether the trip is acceptable.

**Ex. B**
**P. 46**

19

## WHAT TO DO

**BEFORE GIVING A GIFT,** engaging in customer entertainment or reimbursing customer travel expenses, make sure you understand applicable legal requirements, the customer's own rules and GE corporate and business guidelines.

**MAKE SURE RECORDS OF SUCH EXPENDITURES** accurately reflect the true nature of the transaction.

**NEVER OFFER A BUSINESS COURTESY,** such as a gift, contribution or entertainment, under circumstances that might create the appearance of an impropriety.

**NEVER OFFER, PROMISE, PAY OR AUTHORIZE** anything of value (such as money, goods or services) to a government official or employee of a customer to obtain or retain an improper advantage.

**NEVER GIVE A GRATUITY** or other payment to government officials or employees to expedite a routine administrative action without fully disclosing it to the GE National Executive or GE legal counsel. Some national laws that prohibit bribery outside that nation include an exception for "facilitating payments" to expedite a routine administrative action to which a person is otherwise entitled. These payments are often illegal under local anti-bribery laws, and GE strongly discourages them. Make sure you understand the difference between a bribe—corruptly giving someone else a thing of value in exchange for exercising discretion in your favor—and a facilitating payment, which involves the payment of a small amount of money to expedite a routine action to which you are entitled.

**NEVER CONTRIBUTE COMPANY FUNDS** or other company assets for political purposes in the United States without the prior approval of GE's Vice President for Government Relations. Never contribute company funds or other company assets for political purposes outside the United States without the approval of both GE's Vice President for Government Relations and GE's Vice President for International Law and Policy.

**REQUIRE ANY PERSON OR FIRM WHO REPRESENTS GE** (such as a consultant, agent, sales representative, distributor or contractor) to comply with this policy and related laws.

**FOLLOW YOUR BUSINESS'S DUE DILIGENCE PROCEDURES** when selecting persons or firms to represent GE.

Working with customers & suppliers

## WHAT TO WATCH OUT FOR

**BACKGROUND INFORMATION** about existing or potential third-party representatives that indicates:
- Allegations of improper business practices.
- Reputation for bribes.
- Family or other relationship that could improperly influence the decision of a customer or government official.

**ANY DEMAND** to receive a commission payment before the announcement of an award decision.

**ANY SUGGESTION TO DIRECT GE BUSINESS** through a specific representative or partner due to a "special relationship".

**ANY REQUEST** to make a payment in a country or to a name not related to the transaction.

**A COMMISSION** that is disproportionate to the services provided.

Ex. B
P. 47

20  The Spirit & The Letter

# Supplier relationships

**WHAT TO KNOW**

GE's relationships with suppliers are based on lawful, efficient and fair practices. We expect our suppliers to obey the laws that require them to treat workers fairly, provide a safe and healthy work environment and protect environmental quality. Following GE guidelines helps ensure that our supplier relationships will not damage GE's reputation.

---

❓ **ANSWER TO QUESTION ON PAGE 17** Don't shrug it off. It's a big issue—GE's reputation depends on doing business only with suppliers that deal responsibly with their workers and with their local environments.

Ex. B
P. 48

## WHAT TO DO

**COMPLY WITH APPLICABLE LAWS** and government regulations covering supplier relationships.

**DO BUSINESS** only with suppliers that comply with local and other applicable legal requirements and GE guidelines relating to labor, the environment, health and safety. Follow the procedures set out in GE's Supplier Reputational Guidelines, found at **integrity.ge.com.**

**FOLLOW GOVERNMENT ACQUISITION REGULATIONS** when purchasing materials and services for fulfilling government contracts.

**PROVIDE A COMPETITIVE OPPORTUNITY** for suppliers to earn a share of GE's purchasing volume, including small businesses and businesses owned by the disadvantaged, minorities, women and disabled veterans.

**SAFEGUARD GE'S CONFIDENTIAL AND PROPRIETARY INFORMATION** with a confidentiality agreement, and safeguard any supplier-provided information protected by any confidentiality agreement.

**SAFEGUARD "PERSONAL DATA"** obtained from suppliers (for instructions, see "Privacy" on page 28).

Working with customers & suppliers

## WHAT TO WATCH OUT FOR

**CHOOSING SUPPLIERS** on any basis other than open, competitive bidding.

**POTENTIAL CONFLICTS OF INTEREST** in supplier selection, such as accepting improper gifts or other items of value.

**DIRECTING BUSINESS TO A SUPPLIER** owned or managed by a relative or close friend.

**UNSAFE CONDITIONS** in supplier facilities.

**SUPPLIER EMPLOYEES** who appear to be underage or subject to coercion.

**APPARENT DISREGARD** of environmental standards in supplier facilities.

**ENTRUSTING "PERSONAL DATA"** or confidential information to suppliers without ensuring that they have appropriate technical, physical, and organizational measures to prevent unauthorized access or use.

22  The Spirit & The Letter

You seek lower-cost suppliers in key
areas and have found a non-domestic
supplier that looks promising.

**Can you e-mail technical drawings
to see if this new company has the
capabilities you need?**

SEE PAGE 24:
INTERNATIONAL TRADE CONTROLS

A representative from a potential
new customer or supplier has given
you his card, containing his name
and contact details.

**Is it OK to put this information in a
database where other GE personnel
can access it?**

SEE PAGE 28:
PRIVACY



23

A longtime GE customer recently opened a new import/export company in Nevada. Her company wants to purchase medical equipment for a private clinic in the Middle East. She offers to pay via a wire transfer from an account held in the name of a British Virgin Islands company at a bank located in a Pacific island nation.

**Should I be suspicious?**

SEE PAGE 26:
MONEY LAUNDERING PREVENTION

Working with
customers & suppliers

**Ex. B**
**P. 51**

# International Trade Controls

**WHAT TO KNOW**

International Trade Control (ITC) laws affect the transmission of goods, services and technology across national borders. These laws apply to many aspects of GE's operations — not just shipping products. Exchanges of information across national boundaries, including e-mail and web access, are subject to trade controls. The United States also controls the release of technical information to non-U.S. nationals *within* the United States. It is important that we carefully observe ITC laws in connection with these activities.

❷ **ANSWER TO QUESTION ON PAGE 22** It depends on the export classification of the technical information and your business's "Know Your Supplier" policy — check with your business's ITC expert for specific guidance.

25

## WHAT TO DO

**FOLLOW RELEVANT ITC REGULATIONS** of all countries in which you operate and your business's own ITC procedures as they relate to importing and exporting goods, technology, software, services and financial transactions.

**REPORT ALL RELEVANT INFORMATION** to your import manager to ensure accurate and complete import declarations. Ensure GE or its agent provides accurate and complete information to government authorities.

**CHECK THE EXPORT CLASSIFICATION** of the product, software or technology prior to export to determine whether special authorization is required.

**SCREEN YOUR TRANSACTIONS** against all applicable rules that restrict transactions with certain sanctioned countries, persons and prohibited end uses.

**SCREEN ALL YOUR BUSINESS PARTNERS,** suppliers and parties involved in your international transactions against government-provided watch-lists. Follow your business's "Know Your Customer/ Know Your Supplier" procedures.

**DO NOT COOPERATE WITH ANY RESTRICTIVE TRADE PRACTICE** or boycott that is prohibited or penalized under U.S. or applicable local laws.

**CONSULT WITH YOUR MANAGER** if a transaction involves a conflict between U.S. law and applicable local laws, such as the laws adopted by Canada, Mexico and the members of the European Union blocking certain U.S. restrictions.


Working with customers & suppliers

## WHAT TO WATCH OUT FOR

**ANY FACTS, SOMETIMES KNOWN AS "RED FLAGS,"** that suggest your customer may be attempting to evade ITC laws (a complete list of "Red Flags" is available from the International Law & Policy site found at **integrity.ge.com**).

**EVASIVE, RELUCTANT OR OTHERWISE UNSATISFACTORY ANSWERS** by a customer to questions about end use, end user, delivery dates or delivery locations.

**INVOLVEMENT OF PARTIES OR ACTIVITIES** suspected of any connection with the development of biological, chemical or nuclear weapons, or ballistic missiles.

**TRANSACTIONS INVOLVING AN EMBARGOED COUNTRY,** a citizen or representative of an embargoed country or an individual or entity subject to government sanction.

**INVOICES ON IMPORTED GOODS** where the price shown does not reflect the full value, the description of the goods is not complete, or the country of origin is not correctly identified.

**ANY PAYMENT TO THE EXPORTER** or benefiting the exporter that is not included in the invoice price or otherwise reported.

**TRANSFER PRICES** between related parties that fail to cover appropriate costs and profits.

**USE OF AN IMPORT TARIFF CLASSIFICATION** that does not seem to describe the imported goods accurately.

**DESIGNATION OF GE AS THE IMPORTER OF RECORD** (party responsible for an importation) without maintaining necessary processes to comply with import laws.

**ENTRY OF GOODS UNDER A PREFERENTIAL DUTY PROGRAM (GSP, NAFTA, ETC.)** without supportive procedures assuring compliance with the program's requirements.

Ex. B
P. 53

# Money laundering prevention

**WHAT TO KNOW**

People involved in criminal activity — e.g., terrorism, narcotics, bribery, and fraud — may try to "launder" the proceeds of their crimes to hide them or make them appear legitimate. More than 100 countries now have laws against money laundering, which prohibit conducting transactions that involve proceeds of criminal activities. A related concern is that legitimate funds may be used to finance terrorist activity — sometimes called "reverse" money laundering.

GE is committed to complying fully with all anti-money laundering and anti-terrorism laws throughout the world. GE will conduct business only with reputable customers involved in legitimate business activities, with funds derived from legitimate sources. Each GE business is required to implement risk-based "Know Your Customer" due diligence procedures calibrated to the risk in question, and to take reasonable steps to prevent and detect unacceptable and suspicious forms of payment. Failing to detect customer relationships and transactions that place GE at risk can severely damage GE's integrity and reputation.

❷ **ANSWER TO QUESTION ON PAGE 23** Yes, you should be suspicious if a transaction involves transferring funds to or from countries or entities unrelated to the transaction or not logical for the customer. Moreover, requests to transfer money to third parties also raise red flags that need to be investigated to ensure the legitimacy of the transaction. Consult with company counsel or a GE anti-money laundering specialist before proceeding.

27

## WHAT TO DO

**COMPLY WITH ALL APPLICABLE LAWS** and regulations that prohibit money laundering and support and financing of terrorism, and that require the reporting of cash or suspicious transactions. Understand how these laws apply to your business.

**FOLLOW YOUR BUSINESS'S "KNOW YOUR CUSTOMER" PROCEDURES.** Collect and understand documentation about prospective customers, agents and business partners to ensure that they are involved in legitimate business activities and their funds come from legitimate sources.

**FOLLOW YOUR BUSINESS'S RULES** concerning acceptable forms of payment. Learn the types of payments that have become associated with money laundering (for example, multiple money orders or travelers checks, or checks on behalf of a customer from an unknown third party).

**IF YOU ENCOUNTER A WARNING SIGN** of suspicious activity, raise your concern with a designated GE anti-money laundering compliance specialist or company legal counsel and be sure to resolve your concern promptly before proceeding further with the transaction. Ensure the resolution is well documented.

Working with customers & suppliers

## WHAT TO WATCH OUT FOR

**A CUSTOMER, AGENT OR PROPOSED BUSINESS PARTNER** who is reluctant to provide complete information, provides insufficient, false or suspicious information, or is anxious to avoid reporting or record keeping requirements.

**PAYMENTS** using monetary instruments that appear to have no identifiable link to the customer, or have been identified as money laundering mechanisms.

**ATTEMPTS BY A CUSTOMER** or proposed business partner to pay in cash.

**EARLY REPAYMENT** of a loan in cash or cash equivalents.

**ORDERS, PURCHASES OR PAYMENTS** that are unusual or inconsistent with the customer's trade or business.

**UNUSUALLY COMPLEX DEAL STRUCTURES,** payment patterns that reflect no real business purpose, or unusually favorable payment terms.

**UNUSUAL FUND TRANSFERS** to or from countries unrelated to the transaction or not logical for the customer.

**TRANSACTIONS INVOLVING LOCATIONS** identified as secrecy havens or areas of known terrorist activity, narcotics trafficking or money laundering activity.

**TRANSACTIONS INVOLVING FOREIGN SHELL OR OFFSHORE BANKS,** unlicensed money remitters or currency exchangers, or non-bank financial intermediaries.

**STRUCTURING OF TRANSACTIONS TO EVADE RECORD KEEPING** or reporting requirements (for example, multiple transactions below the reportable threshold amounts).

**REQUESTS TO TRANSFER MONEY** or return deposits to a third party or unknown or unrecognized account.

# Privacy

**WHAT TO KNOW**

A growing number of countries are more stringently regulating the collection and use of consumers' "personal data" (names, home and office contact information, and other data). In addition, many countries regulate personal data of company representatives in business-to-business transactions. A few countries even regulate the privacy of information relating to corporations. GE is committed to handling personal data responsibly and in compliance with applicable privacy laws.

❷ **ANSWER TO QUESTION ON PAGE 22** If you collected this data in a country regulated by a "personal data protection" law — for example, most countries in Europe — you may be prohibited by law from using or sharing the information where the person to whom the data pertains has not granted express consent. If you are not sure, consult with the Chief Privacy Leader for your business listed on the Privacy site at Support Central.

## WHAT TO DO

**LEARN AND COMPLY** with the following as they apply to personal data including:

- Applicable laws and regulations of jurisdictions from which the personal data is collected and in which it is processed or used.
- The privacy policies of GE and your business.
- Any contractual obligations that apply.

**COLLECT, PROCESS AND USE PERSONAL DATA** for legitimate business purposes only.

**USE "ANONYMOUS" DATA** (names removed and not identifiable) or "aggregated" data (summarized so as not to be identifiable to an individual) instead of personal data where appropriate or required.

**LIMIT ACCESS** to personal data to individuals who need it for a legitimate business purpose.

**USE CARE** to prevent unauthorized access in processing of personal data or accidental loss or destruction of personal data.

**IF YOU LEARN THAT PERSONAL DATA HAS BEEN USED IN VIOLATION** of this policy or your business's privacy implementing procedures, or if you learn that the security of any system or device containing personal data has been compromised, immediately notify your manager, business Privacy Leader or company legal counsel.

Working with customers & suppliers

## WHAT TO WATCH OUT FOR

**INADEQUATE ACCESS OR SECURITY CONTROLS** for personal data, such as e-mailing or otherwise distributing personal data to a larger group than legitimately needed, or leaving printouts with personal data at a printer, copy machine or fax machine for others to see.

**SHARING OF PERSONAL DATA** with unaffiliated third parties, such as vendors or suppliers, who lack appropriate security safeguards or restrictions on information use.

**TRANSFERS OF PERSONAL DATA** between countries, without considering applicable legal requirements.

Section Two                                    Working with governments

# Government
# business

31

We are entitled to a large payment from
a government customer if we certify that
project installation has been completed.
We're not sure whether a few small items
have been installed yet, but they should
be soon. It's getting close to year-end,
and we'd like to book the payment.

**Can we submit our invoice and
certification now?**

SEE PAGE 32:
WORKING WITH GOVERNMENTS



32  The Spirit & The Letter

# Working with governments

**WHAT TO KNOW**

GE conducts business with national governments and government-owned enterprises. In the course of our work, we frequently interact with government agencies, officials and public international agencies. In every instance, GE employees must apply the highest ethical standards and comply with applicable laws and regulations, including certain special requirements associated with government transactions.

❷ **ANSWER TO QUESTION ON PAGE 31** No, you cannot submit the invoice and certification until you are certain that the entire installation has been completed in accordance with the contract. Submission of an incorrect certification could subject the company, and you personally, to criminal penalties. Therefore, it is extremely important that all certifications submitted to the government be current, accurate and complete.

33

## WHAT TO DO

**ABIDE BY APPLICABLE LAWS** and regulations relating to working with governments, particularly special requirements associated with government contracts and transactions.

**REQUIRE** anyone providing goods or services for GE on a government project or contract — such as consultants, sales representatives, distributors or suppliers — to agree to comply with the intent of GE's Working with Governments policy.

**BE TRUTHFUL AND ACCURATE** when dealing with government officials and agencies.

**ADOPT PROCESSES THAT ENSURE** reports, certifications, statements and proposals are current, accurate and complete and that contract requirements are adequately identified and communicated to the responsible parties.

**DO NOT MAKE ANY UNAUTHORIZED SUBSTITUTIONS** for contracted goods and services or deviate from contract requirements without the written approval of the authorized government official.

## WHAT TO WATCH OUT FOR

**SPECIAL REQUIREMENTS** that apply to transactions with governments, including commercial transactions between private parties financed by government agencies such as the EX-IM Bank, U.S. Agency for International Development, the European Union or the European Bank for Reconstruction and Development.

**INCORRECT OR UNAUTHORIZED COST-CHARGING** on government contracts.

**DEVIATIONS FROM CONTRACT REQUIREMENTS** or unauthorized contract substitutions, such as failure to perform required tests and inspections.

**SUBMISSION OF INACCURATE OR INCOMPLETE** cost or pricing data when this data is required by the government.

**VIOLATING GOVERNMENT REGULATIONS** that establish gratuity restrictions, recruiting and hiring restrictions, or certification procedures.

**ACCEPTING INFORMATION** about a government's competitive selection of a supplier, or a competitor's bid or proposal (unless the contracting officer or agency leader has specifically and lawfully authorized the information's release).

**NEGOTIATING FOR EMPLOYMENT** with a government official or government official's family members while the official has the ability to influence decision-making about contracts with the government.

**VIOLATIONS OF THE U.S. GOVERNMENT ZERO TOLERANCE POLICY** regarding trafficking in persons. This anti-trafficking policy is applicable to employees directly engaged in performance of work on all U.S. Federal Government contracts. Employees that violate this policy may be subject to disciplinary action up to and including termination, and may subject the company to contract termination, suspension or debarment. Our Company's Working with Governments Policy at **integrity.ge.com** provides additional details.

Government business

Ex. B
P. 61

Section Three

Complying with competition laws

# Competing
# globally



35

There is a big account I think my business could land — but only if we partner with one of our competitors to go after it.

**Can we work together without violating the competition laws, or should I let this opportunity pass?**

SEE PAGE 36:
COMPLYING WITH COMPETITION LAWS

Competing globally

**Ex. B
P. 63**

36  The Spirit & The Letter

# Complying with competition laws

**WHAT TO KNOW**

Competition and antitrust laws:

- Prohibit agreements or understandings between competitors that undermine competition;

- Regulate the behavior of dominant companies; and

- Require prior review and in some instances clearance for mergers, acquisitions and certain other transactions, in order to prevent transactions that would substantially reduce competition.

These laws are complex, and global in reach, and can operate differently in any particular situation. Your business provides specific guidelines on addressing contacts with competitors, obtaining and handling data about competitors, and participating in trade and professional associations and standards setting and product certification organizations. In addition, it is often essential that you involve legal counsel early in the process of developing new commercial initiatives given the many uncertainties that arise in the application of these laws.

❷ **ANSWER TO QUESTION ON PAGE 35** Partnering with a competitor for a specific project may be permissible when the result is an improvement in the solution offered to the customer; for example, when both companies together can provide an offering that neither would be able to supply separately. Always seek legal advice before agreeing to work with a competitor on a joint proposal.

## WHAT TO DO

**COMPLY** with all applicable competition laws and regulations as well as competition law decrees, orders and agreements with any competition regulator about how business will be conducted.

**REVIEW AND UNDERSTAND** both GE and business-specific policies and procedures, and if you have questions or issues, bring them up with company legal counsel.

**DO NOT** propose or enter into agreements or understandings—expressed or implied, formal or informal, written or oral—with any competitor regarding any aspect of the competition between GE and the competitor. Do not discuss with a competitor or competitor representative:

- Prices
- Bids
- Sales territories, allocation of customers or product lines
- Terms or conditions of sale
- Production, sales capacity or volume
- Costs, profits or profit margins
- Market share
- Product or service offerings
- Customer or supplier classification
- Distribution methods

**DO NOT** propose or enter into agreements with anyone (including competitors, agents, brokers or customers) regarding whether to submit a bid or the terms of a bid where there is an understanding that the bid is submitted for any purpose other than winning the business.

**AVOID CONTACTS** of any kind with competitors that could create the appearance of improper agreements or understandings.

**DO NOT** propose or enter into agreements or understandings with customers that restrict the price or other terms at which the customer may resell or lease a product or service to a third party.

**DO NOT** propose or enter into agreements or understandings with suppliers that restrict the price or other terms at which GE may resell or lease any product or service.

**CONSULT** with company legal counsel to help reduce the risks of noncompliance in the evaluation of any proposed merger, acquisition, joint venture or any other business arrangement that could raise competition law issues (examples of arrangements that need to be discussed with counsel are listed in "What to Watch Out For" below).

Competing globally

## WHAT TO WATCH OUT FOR

**EXCLUSIVE ARRANGEMENTS** for the purchase or sale of products or services.

**BUNDLING** of goods and services.

**AGREEMENTS THAT RESTRICT A CUSTOMER'S CHOICES** in using or reselling a GE product or service.

**TECHNOLOGY LICENSING** agreements that restrict the freedom of the licensee or licensor.

**SELECTIVE PRICE DISCOUNTING** to only certain customers.

**DISTRIBUTION ARRANGEMENTS** with competitors.

**AGREEMENTS TO ADD A GE EMPLOYEE** to another entity's board of directors.



Section Four

Fair employment practices
Environment, health & safety
Security & crisis management

In the GE
community



40  The Spirit & The Letter

# Fair employment practices

**WHAT TO KNOW**

Fair employment practices do more than keep GE in compliance with applicable labor and employment laws. They contribute to a culture of respect. GE is committed to complying with all laws pertaining to freedom of association, privacy, collective bargaining, immigration, working time, wages and hours, as well as laws prohibiting forced, compulsory and child labor and employment discrimination. Beyond legal compliance, we strive to create an environment considerate of all employees wherever GE business is being conducted.

❷ ANSWER TO QUESTION ON PAGE 39 Yes. Reasonable accommodations should be made to provide access and facilitate full participation in the meeting, or alternative arrangements should be made for you.

Ex. B
P. 68

41

## WHAT TO DO

**BASE EMPLOYMENT DECISIONS** on job qualifications (e.g., education, prior experience) and merit. Merit includes an individual's skills, performance, values, leadership and other job-related criteria.

**MAKE ALL EMPLOYMENT RELATED DECISIONS AND ACTIONS** without regard to a person's race, color, religion, national origin, sex (including pregnancy), sexual orientation, age, disability, veteran status or other characteristic protected by law.

**PROVIDE A WORK ENVIRONMENT** free of improper harassment and bullying.

**RESPECT THE PRIVACY RIGHTS** of employees by using, maintaining and transferring personal data in accordance with GE's Employment Data Protection Standards and related procedures found at integrity.ge.com. (While seeking to maintain employee privacy, GE reserves the right to monitor use of company property, including computers, e-mail, phones, proprietary information, etc., in accordance with applicable law.)

**TAKE LAWFUL AFFIRMATIVE ACTIONS** in the United States, and elsewhere if required by local law, to increase opportunities in employment for women, minorities, people with disabilities and certain veterans.

**IF A CONFLICT ARISES** between the requirements of this policy and the laws, customs or practices of a particular area, consult with management and company legal counsel to determine the most appropriate course of action.

## WHAT TO WATCH OUT FOR

**A HOSTILE WORK ENVIRONMENT** (for example, telling jokes or displaying materials that ridicule or offend a member of a particular race or ethnic group).

**MAKING UNWELCOME SEXUAL ADVANCES** to another employee or person with whom you work.

**VIOLATING A LABOR LAW** in your country (for example, hiring a child under the legal minimum age).

**REFUSING TO WORK,** or otherwise cooperate with, certain individuals because of their race, religion, sex, or other characteristic protected by law.

**DISCLOSING EMPLOYMENT DATA** to a person who does not have the business need, authority or the subject's consent.

**TAKING AN ADVERSE ACTION** against an employee (e.g., firing) because the employee has raised a concern about a violation of policy or law.


In the GE community

FOR MORE IN-DEPTH INFORMATION GO TO: **integrity.ge.com**

**Ex. B**

**P. 69**

42   The Spirit & The Letter



43

You're dispatched to rewire a customer's failing electrical system. Unfortunately, the customer cannot completely shut down the system for repairs as planned. You accomplish most of the job by shutting down parts of the system as needed. Finally, all that remains is some simple rewiring that requires a more disruptive shut-down. The customer asks you, as a favor, to do this work with no shut-down. You feel confident that you can do it with minimal risk.

**Can you do the customer this favor?**

SEE PAGE 44:
ENVIRONMENT, HEALTH & SAFETY

A new customer wants to place a big order with GE, provided the equipment can be shipped to them overnight. That doesn't give us enough time to do the required Watchlist screening.

**Can I ship the equipment today and check the Watchlists tomorrow?**

SEE PAGE 48:
SECURITY & CRISIS MANAGEMENT






Ex. B
P. 71

44  The Spirit & The Letter

# Environment, health & safety

**WHAT TO KNOW**

Protecting the environment and the health and safety of employees is the law — and GE believes it's also the right thing to do. Through management leadership and employee commitment, GE works to conduct its operations in a safe manner that minimizes environmental impact. This policy affects all company activities — not just managing our waste and emissions, but everything we do — for example, selling products, driving a car on company business, acquiring a new business or providing customer service.

❷ **ANSWER TO QUESTION ON PAGE 43** No. GE Policy and safe work practices require that energized machinery be de-energized before work is commenced. While there are limited exceptions to this rule that allow specially trained employees to work on energized equipment when specific safeguards are in place, in general maintenance or repair work should only occur when the machinery or equipment has been de-energized to remove the hazard.

45

## WHAT TO DO

**COMPLY** with all applicable environmental health and safety ("EHS") laws and regulations, and GE EHS policies.

**CREATE AND MAINTAIN** a safe working environment and prevent workplace injuries.

**ASSESS EHS LEGAL AND REPUTATIONAL RISKS** before starting a new activity, venture or project, selling a new product, acquiring a new business or participating in a hazardous business.

**CONSIDER EHS IMPACTS** in the design and production of GE's products and services as part of evaluating the "life cycle" of our products.

**ELIMINATE UNREASONABLE EHS RISKS** from GE's facilities, products, services and activities.

**AS PRACTICABLE, REDUCE TOXIC AND HAZARDOUS MATERIALS;** prevent pollution; and conserve, recover and recycle materials, water and energy.

**CONTINUE TO IMPROVE OUR EHS SYSTEMS** and performance as an integral part of GE's operational strategy.

**PRESENT IDEAS** that support the goals of this policy to your manager or your business's EHS manager.

**PROMPTLY ALERT YOUR MANAGER** or EHS contact of unlawful or unsafe conditions.

## WHAT TO WATCH OUT FOR

**UNSAFE ACTIVITIES AND CONDITIONS,** such as:

- Failure to use personal protective equipment (shoes, safety glasses, hearing protection, gloves, monitors, etc.).
- Unlabeled or unapproved chemicals.
- Exposed or unsafe wiring.
- Blocked fire or emergency exits.
- Unsafe driving, or failure to wear seat belts or follow GE's driving policies.
- Working in high places without fall protection.
- Working beneath heavy, suspended loads, or improperly using cranes.
- Working on electrical or powered equipment without following safety (e.g. "lock-out, tag-out") procedures.
- Working unsafely at a customer site.

- Potential exposure to serious infectious diseases.
- Disabling safety controls or guarding on equipment and machinery.

**FAILURE TO COMPLY** with health, safety or environmental regulations and procedures.

**EHS COMPLAINTS** from employees, customers or neighbors.

**UNREPORTED** environmental, health or safety hazards or accidents.

**FAILING TO RESPOND** promptly to concerns about possible product safety issues.

**MISSED OPPORTUNITIES** for reducing waste and toxic materials.

**FAILING TO FOLLOW GE POLICIES** for the management, shipping, transportation, import/export

and disposal of hazardous materials and chemicals.

**RISKS AND LIABILITY** associated with new acquisitions as well as both new and existing products, processes, services and ventures that present increased legal liability and reputational risk.

**INADEQUATE SECURITY** procedures or practices that may present safety threats to a facility and/or employees.

**NEW PRODUCTS,** processes, ventures or acquisitions that present increased legal liability and reputational risk.



In the GE community

**Ex. B**
**P. 73**

46  The Spirit & The Letter

# Security &
# crisis management

**WHAT TO KNOW**

In an age of increasing terrorist threats, protecting the security of our people, workplaces, information and businesses is critical. It starts with every business implementing a rigorous and comprehensive security and crisis management (SCM) plan. GE's SCM plan includes measures for preventing terrorist and other criminal acts covering our employees, facilities, information, information technology (IT) infrastructure, business continuity and crisis management. In addition, employees must take every precaution to avoid doing business with terrorists or those that support terrorist activity.

❓ **ANSWER TO QUESTION ON PAGE 43** No, don't ship the equipment until the screening is done. GE cannot agree to do business with a customer, supplier or any third party until after all required Watchlist screening has been completed

**Ex. B**
**P. 74**

## WHAT TO DO

**IMPLEMENT RIGOROUS PLANS** to address the security of employees, facilities, information, IT assets and business continuity.

**PARTICIPATE IN** your business's emergency planning and emergency drills.

**COMPLY WITH** the entry and exit rules at GE facilities, including wearing the appropriate badge.

**PROTECT ACCESS** to GE facilities from all but authorized personnel.

**PROTECT IT ASSETS** from theft or misappropriation.

**CREATE AND MAINTAIN** a safe working environment—this includes identifying and reporting indicators of workplace violence.

**COMPLY WITH** global immigration rules when traveling internationally, and ensure that employees or visitors who work for you or are closely associated with your business also comply.

**COMPLY WITH** all GE international travel policies. Obtain appropriate pre-clearances to designated countries.

**CONDUCT** appropriate background checks on new hires and contractors, wherever allowed by law.

**ENSURE PROPER BUSINESS** continuity plans are prepared for an emergency.

**SCREEN** all customers, suppliers, agents and dealers against appropriate terrorist Watchlists.

**REPORT ANY APPARENT** security lapses to your manager, Crisis Management Leader or GE Ombudsperson.

## WHAT TO WATCH OUT FOR

**INDIVIDUALS AT GE FACILITIES** not wearing appropriate badges.

**UNSECURE IT ASSETS,** such as laptops, servers, etc.

**INADEQUATE PROTECTION** of hazardous materials.

**UNSECURE AREAS OF A FACILITY** where only authorized personnel are allowed to enter.

**SECURITY COMPLAINTS** from employees, customers or neighbors.

**UNAUTHORIZED ENTRY** to a facility.

**DOING BUSINESS** with a customer, supplier or any third party without sufficient screening.



In the GE community



Section Five

Intellectual property
Controllership
Conflicts of interest
Insider trading & stock tipping

# Protecting
# GE assets

49

One of our products will soon have a new feature
that will really help it outperform the competition.
A big customer of mine is pressing me to describe
the new feature to her now, because she needs to
make her buying decisions this week. I know GE
wants to patent the feature, but I'm not sure the
application has been filed yet.

**Can I show the customer the new feature?**

SEE PAGE 50:
INTELLECTUAL PROPERTY

I'd like to persuade my customer to
purchase a new product before they
really need it, because it will help
me exceed my quarterly sales goals.
I could offer them a discount, and
we could hold the product at our
plant until they need it.

**If the customer agrees, can I do this?**

SEE PAGE 52:
CONTROLLERSHIP



Protecting GE assets

**Ex. B**
**P. 77**

# Intellectual property

WHAT TO KNOW

GE's intellectual property is one of its most valuable assets. All employees must work to safeguard our patents, trademarks, copyrights, trade secrets and other proprietary information. At the same time, it is critical that we respect the valid intellectual property rights of others. Unauthorized use of others' intellectual property can expose the Company and even individual GE employees to civil law suits and damages, including significant fines and criminal penalties. A key to protecting our intellectual property and, at the same time, guarding against these risks, is the timely and reasonable review of new GE products, services, processes and software, for possible inventions and trade secrets and infringement of the intellectual property rights of others.

---

❷ ANSWER TO QUESTION ON PAGE 49 No. Patent counsel should be consulted first, because showing the feature to the customer before a patent application is filed could result in the loss of GE's right to obtain a patent.

51

## WHAT TO DO

**IDENTIFY AND PROTECT** GE intellectual property.

**FOLLOW THE REQUIREMENTS** of GE's Submitted Ideas Procedure (found at **ge.com/en/subidea**) in handling any unsolicited ideas from outsiders as well as any employee ideas not covered by the "Employee Innovation and Proprietary Information Agreement" (EIPIA). For more information, consult the "Intellectual Property Rights" Management Procedure found at **integrity.ge.com**.

**RESPECT VALID PATENTS,** copyrighted materials and other protected intellectual property of others.

**CONSULT** with Company legal counsel concerning necessary licenses or approvals to use protected intellectual property of others such as patents, trademarks or proprietary information (i.e. information that is in confidence and not publicly known or generally available).

**CONSULT** with company legal counsel before:

- Soliciting, accepting or using proprietary information of outsiders (for example, soliciting from a customer proprietary information of a competitor).

- Disclosing GE proprietary information to outsiders.

- Permitting outsiders to use GE intellectual property.

**UNDERSTAND YOUR RESPONSIBILITIES** to the Company regarding new inventions, ideas that you may develop as a GE employee and the Company's information. Consult with company legal counsel if you have any question about these responsibilities, or about the EIPIA (signed by exempt employees and other employees in a position of trust or likely to make inventions).

**COMPLY** with the guidelines for use of the GE primary trademarks and trade names (available at **gebrandcentral.com**) and GE's "Intellectual Property Rights" Management Procedure found at **integrity.ge.com**.

## WHAT TO WATCH OUT FOR

**ACCEPTING PROPRIETARY INFORMATION** belonging to an outsider, without first consulting company legal counsel.

**DISCUSSING GE PROPRIETARY INFORMATION** with customers or suppliers.

**USING ANOTHER COMPANY** to develop new products or software without a written agreement in place covering ownership and other rights in the developed intellectual property.

**PASSING ON,** for technical or management review, an outsider's suggestion for a new product, product feature, service or name,

without following the GE Submitted Ideas Procedure (found at **ge.com/en/subidea**).

**INTRODUCING, OR PROVIDING INFORMATION** about, a new product or service before patent applications have been filed or a decision has been made not to file an application.

**INTRODUCING A NEW PRODUCT** or service, or new product or service name, before checking for patent or trademark infringement.

**THREATENING** anyone suspected of infringing any GE intellectual property without first consulting with company legal counsel.

**EMPLOYING A NEW PERSON,** especially a person who previously worked for a competitor, without putting in place safeguards to prevent the person from inadvertently disclosing or using the proprietary information of the previous employer.

**EMPLOYING A PERSON** who has not signed the EIPIA in a job where inventions are likely to be made.



Ex. B
P. 79

52  The Spirit & The Letter

# Controllership

**WHAT TO KNOW**

Controllership embodies three fundamental
elements: (1) rules that classify transactions and
balances appropriately; (2) systems and controls
that protect assets and accumulate information
consistently and correctly; and (3) financial and
transaction reporting that is timely and unbiased.
Controllership creates the right environment for
disclosing timely, reliable and accurate information
to government agencies and the public.

---

❼ **ANSWER TO QUESTION ON PAGE 49** No. This can be damaging both economically (giving away margin and
putting strain on a customer relationship) and from an accounting standpoint (not technically a sale,
as the rules for revenue recognition have not been met).

53

## WHAT TO DO

**FOLLOW GE'S GENERAL ACCOUNTING PROCEDURES,** as well as applicable generally accepted accounting principles, standards and regulations for accounting and financial reporting.

**ENSURE THAT FINANCIAL AND NON-FINANCIAL INFORMATION** and operating metrics are reported accurately and in a timely fashion.

**MAINTAIN COMPLETE, ACCURATE AND TIMELY** records and accounts to appropriately reflect all business transactions.

**SAFEGUARD ALL COMPANY ASSETS** (physical, financial and informational).

**PROVIDE TIMELY, CANDID FORE-CASTS** and assessments.

**MAINTAIN SOUND PROCESSES** and controls.

**COMPLY WITH GE'S DOCUMENT MANAGEMENT PROCEDURES** (found at **integrity.ge.com**) as well as all applicable laws and regulations relating to the preservation of documents and records.

**PRESERVE DOCUMENTS AND RE-CORDS** relevant to pending or reasonably foreseeable litigation, audits or investigations, and as directed by Company counsel.

## WHAT TO WATCH OUT FOR

**FINANCIAL RESULTS THAT SEEM INCONSISTENT** with underlying performance.

**INACCURATE FINANCIAL RECORDS,** such as overstated travel and living expense reports, or erroneous timesheets or invoices.

**TRANSACTIONS THAT ARE INCONSISTENT** with good business economics.

**ABSENCE OF CONTROLS** to protect assets from risk of loss.

**PHYSICAL ASSETS** or other resources that could be more fully used, reallocated or disposed of.

**CIRCUMVENTING REVIEW** and approval procedures.

**INADEQUATE ROUTINES AND CONTROLS** at newly acquired businesses and at remote and/or understaffed sites.

**INADEQUATE ROUTINES AND CONTROLS** to preserve documents (including e-mail) for pending or reasonably foreseeable litigation, audits and investigations.

**DISPOSAL OF DOCUMENTS** without knowing what is being discarded or whether the documents are subject to legal preservation requirements.

**FALSE OR EXAGGERATED STATEMENTS** in e-mail, presentations or other documents.

Protect by GE assets

FOR MORE IN-DEPTH INFORMATION GO TO: **integrity.ge.com**



I was chatting with my brother and mentioned that I had an upcoming business trip to close the deal for GE to acquire Company X.

**Could this create a problem?**

SEE PAGE 58:
INSIDER TRADING & STOCK TIPPING



Your cousin owns a company
that supplies raw materials to
a GE business.

**Is that a prohibited conflict
of interest, no matter what
GE business you're in?**

SEE PAGE 56:
CONFLICTS OF INTEREST

Protecting GE assets

**Ex. B
P. 83**

# Conflicts of interest

WHAT TO KNOW

On the job or in your free time, nothing you do should conflict with your responsibilities to GE. No activity at work or at home should hurt GE's reputation or good name. Misusing GE resources or influence is also prohibited. Even when nothing wrong is intended, the appearance of a conflict can have negative effects. It is crucial to consider how your actions might appear, and to avoid the perception of a conflict of interest.

---

**ANSWER TO QUESTION ON PAGE 55** This is not explicitly prohibited, but the Conflicts of Interest policy requires that you disclose the situation to GE management, and that you not attempt to influence GE business with your cousin's company.

57

## WHAT TO DO

**DISCLOSE** (in writing to your manager and to company legal counsel) all of your outside activities, financial interests or relationships that may either present a conflict or the appearance of one.

**USE GOOD JUDGMENT** in all personal and business dealings outside your GE job.

**AVOID ACTIONS OR RELATIONSHIPS** that may cause potential conflicts or create the appearance of a conflict with your job or GE's interests.

**DO NOT MISUSE** or use for personal gain GE resources, intellectual property, time or facilities — this includes office equipment, e-mail and computer applications.

**DO NOT TAKE** for yourself personally any opportunities that GE could have an interest in that are discovered through the use of GE position, information or property.

**GET APPROVALS** before accepting officer or director positions with an outside business while you are a GE employee.

**GET YOUR MANAGER'S APPROVAL** when accepting not-for-profit board positions, particularly if the organization has a GE relationship or might expect GE financial or other support.

## WHAT TO WATCH OUT FOR

**FINANCIAL INTERESTS** in a company where you could personally affect GE's business with that company (for example, a customer, supplier or investment).

**PART-TIME JOBS** which you perform using GE hours or GE equipment or materials.

**GIFTS** of other than nominal value from suppliers, customers or competitors, particularly if you're making decisions (on GE's behalf) that involve them.

**PERSONAL DISCOUNTS** or other benefits from suppliers, service providers or customers that the public or your GE peers do not receive.

**DIRECTING BUSINESS** to suppliers when you know they are owned or managed by your family members or close friends.

**MISUSING GE RESOURCES,** your position or influence to promote or assist an outside activity.

**HIRING, PROMOTING OR DIRECTLY SUPERVISING** a family member or close friend.

**PERSONAL RELATIONSHIPS** that may conflict with your GE responsibilities or compromise company interests.

Protecting GE assets

FOR MORE IN-DEPTH INFORMATION GO TO: **integrity.ge.com**

**Ex. B**
**P. 85**

58   The Spirit & The Letter

# Insider trading & stock tipping

**WHAT TO KNOW**

In the course of your job, you may learn of material information about GE or other companies before it is made public. You may simply overhear a hallway conversation or come across a memo left at a copy machine. Using this information for your financial or other personal benefit or conveying this information to others constitutes a violation of this policy and may even violate the law. This includes buying or selling the securities of any company about which you have material non-public information and giving this "inside information" to anyone else who might base financial trades on the information you've shared.

❷ **ANSWER TO QUESTION ON PAGE 54** Yes, if Company X is a public company and the possible acquisition of Company X has not been publicly announced. If your brother trades Company X stock based on your tip, both of you could be charged with insider trading.

59

## WHAT TO DO

**DO NOT BUY OR SELL** the securities of any company, including GE, either directly or through family members or other persons or entities, while you are aware of inside information about the company. (This is known as "insider trading.")

**DO NOT RECOMMEND OR SUGGEST** that anyone else buy or sell the securities of any company, including GE, while you have inside information about the company. (This is known as "tipping.")

**MAINTAIN THE CONFIDENTIALITY** of Company information and do not convey information to anyone outside the Company unless it is necessary for the Company's business activities.

**IF THE NATURE OF YOUR BUSINESS'S ACTIVITIES** and your position in the business subject you to additional requirements relating to buying and selling securities (such as pre-clearing personal trades through the Transaction Control Authority, found at **integrity.ge.com**), learn and follow all of those requirements.

**IF QUESTIONS ARISE,** consult company counsel before trading in the security or disclosing company information.

## WHAT TO WATCH OUT FOR

**NON-PUBLIC INFORMATION WHICH, IF DISCLOSED,** would reasonably be expected to affect the price of a security or would influence your decision to buy, sell or hold a security, such as an earnings announcement or a prospective acquisition announcement (this is known as "inside information").

**BUYING OR SELLING A SECURITY** because you hear or learn of information at work that you think will make the price go up or down once it's publicly announced.

**ENGAGING IN TRADING ACTIVITY** around the time of a significant company announcement.

**DISCUSSING GE BUSINESS** with family and friends.

**TALKING ABOUT WHAT YOU'RE WORKING ON** or where you're going on company business or who visited the office.

Protect GE assets

FOR MORE IN-DEPTH INFORMATION GO TO: **integrity.ge.com**

Ex. B
P. 87

60  The Spirit & The Letter

# Index

**A**
Acquisition  21, 36, 37, 45, 58, 59
Affiliates  5, 61
Affirmative action  41
Agent  5, 19, 25, 27, 37, 47
Antitrust laws  36
Appendix  61
Assets  13, 19, 47, 48, 50, 52, 53

**B**
Board of directors  9, 37
Boycotts  25
Bribery  18, 19, 26
Business policies and procedures  12, 37

**C**
Cash transactions  27
Code of conduct  1, 2, 3
Commission  19
Competing globally  13, 34–37
Competition laws, complying with  34–37
Competitors  33, 35, 36, 37, 51, 57
Compliance specialists  4, 6, 9, 27
Concerns, Integrity  1, 4, 6, 7, 8–10, 11, 41, 45
Confidential information  8, 21, 59
Confidentiality  8, 21, 59
Conflicts of interest  3, 21, 48, 55, 56–57
Conflicts between laws  41, 61
Consultants  5, 19, 33
Contractors  5, 19, 47
Contracting officer  33
Contributions  19
Controlled affiliates  5, 61
Controllership  48, 49, 52–53
Copyrights  50, 51
Cost-charging  33
Crisis Management  38, 43, 46–47
Customer relationships  26, 52

**D**
Disability  41
Discrimination  40
Distributors  5, 19, 33
Due diligence  19, 26

**E**
Embargoed countries  25
Employee responsibilities  1, 6, 12, 32, 50, 51, 56, 57
Employment Practices  3, 11, 33, 38, 39, 40–41
Entertainment  18, 19
Environment  3, 20
Environment, health & safety  20, 21, 38, 43, 44–45
Ethical conduct  1, 2, 3, 7
Ethical standards  32
Exports  23, 24, 25, 45

**F**
Fair employment practices  3, 38, 39, 40–41
Facilitating payment  19
Family  19, 33, 57, 59
Financial records  53
Financial reporting  52, 53

Forecasts  53
Fund transfers  23, 26, 27

**G**
Generally accepted accounting
   principles  53
Gifts  18, 19, 21, 57
Government business  13, 30–33
Government contracts  21, 33
Gratuity  19, 33

**H**
Harassment  41
Hazardous materials  45, 47
Health  20, 21, 38, 43, 44, 45
Hiring  33, 41, 57
Hostile work environment  41

**I**
Imports  23, 25, 45
Improper payments  16, 17, 18–19
In the GE community  13, 38–47
Independent contractors  5, 19, 47
Inside information  58, 59
Insider trading & stock tipping  48, 54, 58–59
Integrity Web site  4, 6, 9, 21, 25, 41, 51, 53, 59, 62
Intellectual property  48, 49, 50–51, 57
International Trade Controls (ITC)  16, 22, 24–25

**J**
Joint venture  37

**K**
"Know Your Customer"  25, 26, 27
"Know Your Supplier"  24, 25

**L**
Laundering money  16, 23, 26, 27
Leadership responsibilities  1, 3, 7, 11
Licenses  51
Licensing agreements  37

**M**
Merger  36, 37
Minorities  21, 41
Money laundering prevention  16, 23, 26–27

**N**
Non-controlled affiliates  5
Non-public information  58, 59
Not-for-profit  57

**O**
Ombudsperson  1, 4, 6, 7, 9, 47
Outside activities  57

**P**
Part-time job  57
Patents  49, 50, 51
Payments  16, 17, 18–19, 25, 26, 27, 31
Penalties for violations  11
Personal data  20, 28, 29, 41
Political contributions  19
Price  17, 25, 37, 59
Privacy  16, 21, 22, 28–29, 40, 41
Property, company  41

Property, intellectual  48, 49, 50–51, 57
Proprietary information  21, 41, 50, 51
Protecting GE assets  13, 48–59

**R**
Raising a concern  6, 8–10, 11
Red flags  25, 26
Regulatory  14, 15
Relatives  21
Responsibilities, employee  1, 6, 12, 32, 50, 51, 56, 57
Responsibilities, leader  1, 3, 7, 11
Restrictive trade practice  25
Retaliation  7, 8, 11

**S**
Safety  21, 38, 43, 44, 45
Sales representatives  5, 19, 33
Securities  58, 59
Security and crisis management  29, 38, 43, 45, 46–47
Sexual advances  41
Stock tipping  48, 54, 58–59
Submitted Ideas Procedure  51
Subsidiaries  5, 61
Supplier relationships  16, 17, 20–21
Supplier Reputational Guidelines  21
Suppliers  13, 16, 17, 20–21, 22, 24, 25, 29, 33, 37, 46, 47, 51, 57
Suspicious transactions  23, 26, 27

**T**
Terrorism  26–27, 46–47
Third parties  5, 7, 19, 26, 27, 29, 37, 46, 47
Toxic materials  45
Trademarks  50, 51
Trade names  51
Trade secrets  50
Transaction Control Authority  59
Transactions  19, 25, 26, 27, 28, 32, 33, 35, 52, 53
Travel and living expenses  18, 19, 53

**V**
Veterans  21, 41
Violations  4, 6, 7, 8, 11, 12, 29, 41, 58

**W**
Watchlists  25, 43, 46–47
Web site  4, 6, 9, 62
Working with customers & suppliers  13, 16–29
Working with governments  30, 31, 32–33
Women  21, 41

**Y**
Your personal commitment  1, 4

# Appendix

## WHICH LAW APPLIES

GE conducts business in more than 100 countries around the world. Our employees are citizens of many different countries. As a result, our operations are subject to the laws of many countries, provinces, states and municipalities, and organizations such as the European Union.

An important challenge for all of us is to understand how these laws may apply to our operations. GE, the parent company, is a corporation organized in the United States. The laws of the United States frequently extend to the operations of GE and its affiliates throughout the world, as well as to the business activities of GE employees wherever they live and work. Other countries may also apply their own laws outside of their borders to their own citizens and to corporations that are organized under their laws, such as GE subsidiaries or other controlled affiliates.

The references in GE policies to the laws of the United States and the other countries where we do business reflect the reality that a global company is regulated by many different laws at the same time. In some instances, there may be a conflict between the applicable laws of two or more countries. When you encounter such a conflict, it is especially important to consult company legal counsel to understand how to resolve that conflict properly.

©2008 General Electric Company    Printed in the U.S.A.

The cover to this document was printed on paper made with 30% postconsumer waste fiber. The paper was manufactured using wind-generated energy and is Green Seal certified. The inside pages to this document were printed on paper containing 10% postconsumer recovered fiber and manufactured with green power in the form of electricity generated from renewable resources including 85% Hydro Power, 10% Wind Power and 5% Biogas.

GE employed a printer that produces all of its own electricity and is a certified totally enclosed facility that produces virtually no volatile organic compound emissions.

General Electric Company
Fairfield, Connecticut 06828

# Visit the integrity
# Web site
# **integrity.ge.com**

**GE intranet: for employees only**

**You'll find more information including:**

- Complete policies, including questions and answers
- Procedures and guidelines
- How to raise a concern
- How to contact an expert
- Business integrity Web sites
- Compliance training
- Tools and resources



0X/08/S&L/XXMM/E

Ex. B
P. 90

# EXHIBIT C

# PROPRIETARY INFORMATION & INVENTION AGREEMENT

In consideration of my employment by the Employer, any opportunities for advancement or reassignment which the Employer may from time to time offer me, the compensation paid to me in connection with such employment, and the mutual understandings set forth below, the Employer and I agree as follows:

1.  For purposes of this Agreement the term(s):
    a.  "Employer" means GE Aviation Systems LLC.
    b.  "Invention" include inventions, discoveries and improvements to existing technology.
    c.  "Proprietary Information" means information not generally known outside GE Aviation or information entrusted to any member of GE Aviation by third parties. This information may relate, for example, to inventions, computer technology and programming, research, development, engineering, manufacturing, purchasing, accounting, marketing or selling. This information may be contained in materials such as drawings, models, data specifications, reports, compilations, or computer programs, or may be in the nature of unwritten knowledge or know-how.

2.  All Proprietary Information which I conceive or develop, either alone or with others, during the term of this Agreement, shall be the exclusive property of the Employer. I will preserve in confidence and will not disclose or use, either during or after the term of this Agreement, any Proprietary Information known to me as a result of my employment except as required in my work for the Employer or as authorized in writing by the Employer. Upon termination of my employment, I will deliver to the Employer all materials in my possession which contain Proprietary Information. In my work for the Employer, I will refrain from unauthorized use of information owned by former employers or other third parties.

3.  Except as set forth in the NOTICE below, all Inventions which I conceive, develop or first actually reduce to practice, either alone or with others, during the term of this Agreement and for six months thereafter, shall be the exclusive property of the Employer. I will disclose such Inventions to the Employer promptly and in writing in accordance with written Employer procedures, a copy of which shall be provided to me upon request. When requested, I will assist the Employer or its designee in effort to protect such Inventions.

4.  I understand and agree that the Employer or its designee will determines, in its sole and absolute discretion, whether an application for patent will be filed on any Invention which is the exclusive property of the Employer, as set forth above, and whether such an application will be abandoned prior to issuance of a patent.

5.  This agreement is not a contract of employment, and no rights to hire or continuation of employment, or to advancement or reassignment, are hereby created. This Agreement supersedes and replaces any prior agreements between me and the Employer relating to the same subject matter, but shall not affect any rights or obligations, other than those pertaining to release of the Employer's rights in Inventions, already established under such a prior agreement.

6.  I will not assign this Agreement or any of my rights and obligations hereunder, either during or after the term of this Agreement, without the written consent of the Employer. This Agreement shall be binding upon my heirs and personal representatives, and upon the Employer and its successors and assigns. To the extent that State law governs this Agreement, it shall be the laws of the State of California.

7.  When signed by be, this Agreement shall continue in effect until, and terminate when, my employment is terminated, provided that termination of this Agreement shall not affect the continuing rights and obligations set forth above.

NOTICE:  This Agreement does not apply to any Invention for which no equipment, supplies, facility or trade secret information of the Employer was used and which was developed entirely on the employee's own time, unless (a) the Invention relates (i) directly to the business of the Employer, or (ii) to the Employer's actual or demonstrably anticipated research or development, or (b) the Invention results from any work performed by the employee for the Employer; nor does this Agreement apply to any rights of the employee in an invention which, under California State Law, may not be assigned to the Employer pursuant to any employment agreement.

Name of Employee _____Erwin Liang_____ signature _____ Date _8/15/2011_

Witness _____  Date _____

# EXHIBIT D



*To Employees Preparing to Sign the Employee Innovation and Proprietary Information Agreement*

The attached agreement is intended to define the rights and obligations, as between you and the General Electric Company or the General Electric Company affiliate for which you work, pertaining to inventions or innovations which you may make while a company employee.  It also sets forth obligations and rights in regard to confidential or secret information of the company and others.

Should you have any questions concerning the meaning of the agreement, please do not hesitate to ask for consultation with the Intellectual Property Counsel serving your company.

Very truly yours,

Carl Horton
Chief Intellectual Property Counsel

General Electric Company

Employ    Innovation and Proprietary Information Agree    ent
*(Distribution: One signed original – …iginal to business component's permanent bus…ss records and copy to employee)*

TO:    GENERAL ELECTRIC COMPANY        (hereinafter referred to as the "Company". "Company" may also refer to other legal entities as hereinafter specified.)

In consideration of my employment by Company (and my employment by General Electric Company and controlled (directly or indirectly) subsidiaries or affiliates of General Electric Company in the United States), and the compensation paid to me by the Company, I ("employee") agree:

(a) to disclose and assign to the Company (or as the Company may direct) as its exclusive property, all inventions, discoveries, innovations, improvements, trade secrets and technical or business information which I may solely or jointly develop, conceive, reduce to practice or author during the period of my employment (1) that relate to the business or the present or demonstrated or reasonably foreseeable future research or development of the Company or its parent, subsidiaries or affiliates, or (2) that result from or are suggested by any work that I may do for the Company or its parent, subsidiaries or affiliates or (3) that are otherwise made through the use of Company, or its parent, subsidiaries or affiliates, time, equipment, supplies, facilities, material or secret* or confidential* information or data.  To the extent that any court of competent jurisdiction finds that any provision of this paragraph is unenforceable because it requires the assignment of any invention in contravention of the law or public policy of that jurisdiction, this paragraph shall be interpreted to impose only the maximum permissible assignment obligation. [NOTICE: This is the notice required by the states of CA, IL, KS, MN and WA, and any other state requiring such notice, notifying employees in such states that they are not obligated to assign to the Company any rights in an invention that the employee developed entirely on his or her own time without using the Company's equipment, supplies, facilities, material or trade secret information unless those inventions either (1) relate to the Company's business or actual or demonstrably anticipated research or development of the Company at the time the invention was made; or (2) result from any work performed by the employee for the Company.]

(b) that all original works of authorship that are made by me (solely or jointly with others) within the scope of my employment and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act (17 U.S.C. Sec.101) and I further agree, to the extent any such sole or joint work within the scope of my employment is determined not to be a "work made for hire," that I will disclose and assign to the Company (or as the Company may direct) as its exclusive property any such original work of authorship and any copyright therein;

(c) to execute, upon the request of the Company, all necessary papers and otherwise provide proper assistance (at the Company's expense), during and subsequent to my employment, to enable the Company to obtain for itself or its nominees (and to vest legal title in the Company or its nominees in), patents, copyrights, or other legal protection for such inventions, discoveries, innovations, improvements, original works of authorship, trade secrets and technical or business information in any and all countries;

(d) to make and maintain for the Company adequate and current written records of all such inventions, discoveries, innovations, improvements, original works of authorship, trade secrets and technical or business information;

(e) at the Company's request, or upon any termination (or other ending) of my employment to deliver to the Company promptly all items that belong to the Company or its parent, subsidiaries or affiliates or that by their nature are for the use of Company employees only, including, without limitation, all written and other materials that are of a secret* or confidential* nature relating to the business of the Company or its affiliates;

(f) not to use, publish or otherwise disclose (except as my Company duties may require), either during or subsequent to my employment, any secret* or confidential* information or data of the Company or its parent, subsidiaries or affiliates or any information or data of others that the Company or its parent, subsidiaries or affiliates are obligated to maintain in confidence;

(g) not to disclose or use in my work with the Company any secret or confidential information of others (including any prior employers), or any inventions or innovations of my own that are not included within the scope of this agreement;

(h) I acknowledge that breach of any obligation or other provision of this agreement may cause irreparable injury to the Company which cannot be fully compensated by money.  I therefore agree that in the event of any breach or threatened breach of this agreement by me, the Company shall be entitled to injunctive or other equitable relief as may be permitted by law.

(i) that the Company where permitted by law, may, at any time and without further consent, access and monitor a) any documents, data or information relating to my employment and b) my usage of Company information and resources, including but not limited to: computers, computer software, electronic mail, on-line services, voice mail, facsimile machines, telephones and photocopiers;

(Rev: 11/2007)

Page 1 of 2

Ex. D
P. 93

(j)  that my employment with the Company is "at will" and that both the Company and I have the right to terminate my employment at any time, with or without advance notice and with or without cause.

(k)  that, if at any time, I am an employee of General Electric Company or a controlled (either directly or indirectly) subsidiary or affiliate of General Electric Company in the United States, then with respect to, and for purposes of, such employment with any of these entities 1) my obligations under this Agreement shall apply to all such employment and 2) "Company" as used in this Agreement shall refer to, General Electric Company or such controlled subsidiary or affiliate, as the case may be.

(l)  I understand and agree that Company may, in the ordinary course of business, reproduce this original agreement by any means including, but not limited to, electronic copying, electronic faxing or electronic scanning, storing and printing and I hereby accept, acknowledge and recognize such reproductions as authentic in lieu of this original agreement and hereby accept (and will not object to) any use whatsoever by Company of such reproductions including, without limitation, admission and use in any proceeding in any country including those in or before any agency, patent office, court or tribunal.  I further agree that such reproductions shall have the same force and effect as this original agreement.

This agreement supersedes and replaces, as of the date below appearing under my name, any prior existing agreement (which shall remain effective with respect to matters relating to my employment prior to such date) between the Company and me relating generally to the same subject matter and this agreement shall be effective with respect to matters relating to my employment on or after such date.  This agreement may not be modified or terminated, in whole or part, except in writing signed by an authorized representative of the Company.  Discharge of my undertakings in this agreement shall be an obligation of my executors, administrators, or other legal representatives or assigns.  In the event that any court of competent jurisdiction concludes that any provision (or portion of any provision) of this agreement is unenforceable because it conflicts with the law or public policy of that jurisdiction, the parties agree that the court should first narrow or otherwise interpret the provision to the extent necessary to conform it to the law or public policy of that jurisdiction.  In the event that the court concludes that it is unable to narrow or otherwise interpret the provision so that it is neither invalid, illegal or otherwise unenforceable, the validity, legality and enforceability of the remaining provisions shall in no way be affected or impaired thereby.

I represent that, except as stated below, I have no agreements with or obligations to others in conflict with the foregoing.

*These terms are used in the ordinary sense and do not refer to the official security classifications of the United States Government.  The Company generally considers "secret" or "confidential" any information or data that is not generally known - regardless of whether such information or data is in oral, written, machine readable or other form.  When in doubt, you should assume that information or data is secret or confidential unless or until determined otherwise.  Without limitation, examples of information or data that may be of a secret or confidential nature are: drawings, manuals, notebooks, reports, models, inventions, formulas, processes, machines, compositions, computer programs, accounting methods, business plans, information systems, customer and employee lists and any information and data in electronic form.  For further information, you should consult your Company's assigned legal counsel.*

| TYPE OR PRINT IN INK | |
|---|---|
| Full Name   *Erwin Liang* | Component |
| Single Sign On No.   20000122 | Location   *Duarte, CA* |

_____(Signed)_____
Witness (The employee's immediate manager or other          (Employee's signature - to include employee's first name in full)
appropriate representative of the Company)

_____          _____
Employee's Position          Date

Countersigned - Authorized Company Representative (Required only when this agreement supersedes prior agreement)

The following are the only agreements to which I am a party that may be in conflict with the obligations undertaken above:

_____

_____

_____

(Rev: 11/2007)

# EXHIBIT E

McAfee Endpoint Encryption Logon – Password

**SafeBoot**
MOBILE DATA SECURITY

Device Encryption™
for PC/Laptop
Version 5

Copyright © 1992-2006 SafeBoot N.V.

This computer system may be accessed and used only by GE employees and other authorized personnel and only for legitimate business purposes and in accordance with applicable GE policies and guidelines. Please review www.ge.com/Acceptable Use Guidelines at http://supportcentral.ge.com/RULES.

User name:

Password:

☐ Change password

OK          Cancel

Ex. E
P. 95

# EXHIBIT F